# EXHIBIT 1





# LORAIN COUNTY
## Court of Common Pleas

**TOM ORLANDO, Clerk**
LORAIN COUNTY JUSTICE CENTER
225 COURT STREET
ELYRIA, OHIO 44035

*Cashier/Bookkeeping (440) 329-5625*

| RECEIPT INFORMATION | |
|---|---|
| Receipt Number:<br>**21-0017473** | Receipt Date/Time<br>**Jul 20 2021  8:33AM** |
| Receipt Type:<br>**Civil Case Receipt** | |

| CASE INFORMATION | |
|---|---|
| Case Number:<br>**21CV203965** | Judge:<br>**Hon. Judge Mark A. Betleski** |
| Case Caption:<br>**MICHAEL F ABFALL VS PHH MORTGAGE CORPORATION** | |

| PAYMENT INFORMATION | |
|---|---|
| Paid By:<br>**THE DANN LAW FIRM CO LPA** | Paid For: |
| Payment Type:<br>**Check** | Paid To:<br>**C.H.** |
| Amount Tendered:<br>**$300.00** | Balance Due (after this payment):<br>**$0.00** |
| Description:<br>**NEW CASE** | |

# *21CV203965*

www.LorainCounty.us/Clerk

## IN THE COURT OF COMMON PLEAS
## LORAIN COUNTY, OHIO

FILED
LORAIN COUNTY

2021 JUL 20  A 8: 36

COURT OF COMMON PLEAS
TOM ORLANDO

| | |
|---|---|
| **MICHAEL F. ABFALL,** individually, and on behalf of all others similarly situated, 34175 Detroit Road Avon, OH 44011-1962 <br><br> Plaintiff, <br><br> v. <br><br> **PHH MORTGAGE CORPORATION d.b.a. PHH MORTGAGE SERVICES,** c/o Corporation Service Company 50 West Broad Street, Suite 1330 Columbus, OH 43215 <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR DAMAGES** <br><br> **JURY DEMAND ENDORSED HEREON** <br><br> # 21 CV 203 65 <br><br> JUDGE MARK A. BETLESKI |

Plaintiff Michael F. Abfall, individually, and on behalf of all others similarly situated, by and through counsel, brings this action against Defendant PHH Mortgage Corporation d.b.a. PHH Mortgage Services, and states as follows for his Class Action Complaint:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Michael F. Abfall ("Plaintiff" or "Abfall") is a natural person residing in Lorain County, Ohio.

2.      Defendant PHH Mortgage Corporation d.b.a. PHH Mortgage Services ("Defendant" or "PHH") is a foreign corporation incorporated under the laws of the State of New Jersey that maintains its headquarters and principal place of business at 1 Mortgage Way, Mount Laurel, NJ 08054.

3.      PHH does business in the state of Ohio and is licensed to do business in the state of Ohio as a foreign corporation.

4.    Jurisdiction is appropriately laid in the Court of Common Pleas of Ohio as Plaintiff resides in the State of Ohio, PHH conducts business within the State of Ohio, and Plaintiff's causes of action arose within the State of Ohio.

5.    Venue lies in the Court of Common Pleas for Lorain County Ohio as all causes of action arose out of transactions occurring within and concerning real estate located within Loan County, Ohio.

## STATEMENT OF FACTS

### *Plaintiff's and Late Fee Class Members' Loans*

6.    PHH is the servicer of Plaintiff's and Late Fee Class (defined *infra*) members' notes, and mortgages on real property that secure those notes (collectively, the "loans").

7.    As a mortgage loan servicer, PHH—on behalf of the assignees, investors, and/or owners to whom payments towards the loans are ultimately due—regularly attempts to secure payments on customers' mortgage loans, including Plaintiff's and Late Fee Class members' loans.

8.    Plaintiff's and Late Fee Class members' loans contain substantially similar language, as they were drafted using standardized templates, specifically, the "Uniform Instruments" required by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") and otherwise commonly used by lenders in the origination of mortgages.

9.    When PHH acquired the servicing rights to Plaintiff's loan and FDCPA Subclass (defined *infra*) members' loans, Plaintiff and FDCPA Subclass members were in default of their obligations thereunder.

10.   PHH is a "debt collector" as defined by 15 U.S.C. § 1692a(6), as it regularly engages, or attempts to engage, in the collection of "debts", and it regularly collects debts owed or

due, or asserted to be owed or due, to another for which the primary purpose is for personal, family, or household use, including Plaintiff's and Late Fee Class members' loans.

11.     PHH, is a mortgage servicer, as defined by R.C. 1322.01(AA), as it is an entity that "for itself or on behalf of the holder of a mortgage loan, holds the servicing rights, records mortgage payments on its books, or performs other functions to carry out the mortgage holder's obligations or rights under the mortgage agreement including, when applicable, the receipt of funds from the mortgagor to be held in escrow for payment of real estate taxes and insurance premiums and the distribution of such funds to the taxing authority and insurance company."

12.     PHH, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

13.     PHH is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, License Nos. RM.804016.000,     RM.804016.016-BR,     RM.804016.018-BR,     RM.804016.021-BR, RM.804016.024-BR, and RM.804016.025-BR. R.C. 1322.01(GG).

14.     Plaintiff and each member of the Ohio Subclass (defined *infra*) is a "buyer" as defined by R.C.1322.01(H), as each is an individual whose loan is serviced by a mortgage servicer, PHH.

15.     Pursuant to the terms of Plaintiff's and Late Fee Class members' loans, Plaintiff and Late Fee Class members are (or were) required to make periodic, monthly installment payments on their loans until the entire balance is paid in full. *See*, note for Plaintiff's loan ("Plaintiff's Note"), ¶ 3, attached hereto as **Exhibit 1**; *see also*, a copy of Plaintiff's mortgage ("Plaintiff's Mortgage"), attached as **Exhibit 2**, ¶ N.  Plaintiff's and Class members' loans

specifically refer to these periodic installment payments as "monthly payments." *See, e.g.*, Plaintiff's Note, ¶¶ 3, 6.

16.     Plaintiff's and Late Fee Class members' loans further provide that if any "monthly payment" is not paid within a certain number of days after it is due, Plaintiff and Class members will be required to pay a "late charge." *See*, Plaintiff's Note, ¶ 6(A); *see also*, Plaintiff's Mortgage, ¶ 1.

17.     Pursuant to the terms of Plaintiff's and Late Fee Class members' loans, if Plaintiff and Class members fail to timely make each required "monthly payment," they will be in default on their loans. *See*, Plaintiff's Note, ¶ 6(B). Plaintiff's and Late Fee Class members' loans further provide that if they are in default, the "Note Holder"—*e.g.*, the current owner of the loan, or the servicer of the loan (on behalf of the current owner of the loan)—may send them written notice that if they do not pay the delinquent balance of their respective loans by a certain date, the Note Holder may require them to immediately pay the full balance of their respective loans—*i.e.*, Plaintiff's and Late Fee Class members' loans would be "accelerated." *See*, Plaintiff's Note, ¶ 6(C); *see also*, Plaintiff's Mortgage, ¶ 22.

18.     Based on the plain terms of Plaintiff's and Late Fee Class members' loans, Plaintiff and Late Fee Class members are (or were) no longer required to make "monthly payments" on their loans after acceleration. Indeed, acceleration, by definition, requires a borrower to pay the *entire balance* of a loan *immediately*, instead of in preset installment amounts made at regularly scheduled and predetermined intervals. *Compare*, Plaintiff's Note, ¶ 6(C) (describing Plaintiff's payment obligations after acceleration) *with* Plaintiff's Note, ¶ 3 (describing Plaintiff's "monthly payment" obligations).

19.     As noted, *supra*, the terms of Plaintiff's and Late Fee Class members' loans establish that the condition precedent to the imposition of "late charges" is the failure to comply with their "monthly payment" obligations. *See,* Plaintiff's Note, ¶ 6(A). However, after acceleration, that condition precedent can no longer occur because Plaintiff's and Late Fee Class members' obligation to make "monthly payments" ceases. Therefore, Plaintiff's and Late Fee Class members' loans *do not* authorize the imposition of "late charges" after acceleration.

### *PHH's Improper Imposition of Late Charges*

20.     At some point during the time relevant to this action, Plaintiff's and Late Fee Class members' loans were each in default due to their failure to timely remit periodic "monthly payments" on their loans. *See,* Plaintiff's Note, ¶ 6(B).

21.     In compliance with the terms of Plaintiff's and Late Fee Class members' loans, the assignees, investors, owners and/or servicers of the loans, sent notices of default to Plaintiff and Late Fee Class members stating that if Plaintiff and Late Fee Class members did not pay all overdue amounts, they would require Plaintiff and Late Fee Class members to immediately pay the full amount of unpaid principal and all the interest owed on such amount—*i.e.*, Plaintiff's and Late Fee Class members' loans would be "accelerated." *See,* Plaintiff's Note, ¶ 6(C).

22.     After receiving the notices of default, Plaintiff and Late Fee Class members did not remit further payments on their loans. As a result, the assignees, investors, owners and/or servicers of the loans, accelerated Plaintiff's and Class members' loans. *See,* Plaintiff's Note, ¶ 6(C).

23.     For the reasons set forth *supra*, at the time Plaintiff's and Late Fee Class members' loans were accelerated, their obligation to remit timely periodic "monthly payments" on their loans ceased, as they were instead required to *immediately* pay the *entire balance* of their loans. *See,* Plaintiff's Note, ¶ 6(C).

24.     Since Plaintiff and Late Fee Class members no longer had the obligation to remit timely periodic "monthly payments" on their loans, the condition precedent relative to the imposition of "late charges"—*i.e.*, the failure to timely remit "monthly payments"—did not, and could not, exist.

25.     Nevertheless, PHH—acting on its own behalf, and on behalf of the assignees, investors, and/or owners of such loans—continued to impose "late charges" against Plaintiff and Late Fee Class members (the "Improper Late Fees"). For the reasons stated above, these Improper Late Fees were not authorized by the terms of the loans or otherwise by law.

26.     PHH's imposition of Improper Late Fees is part of a pattern and practice of behavior.

### The Harm to Plaintiff and Late Fee Class Members

27.     PHH's actions described hereon harmed Plaintiff and Late Fee Class members in several ways, as specified *infra*.

28.     PHH, acting on its own behalf or on behalf of the assignees, investors, and/or owners of Plaintiff's and Late Fee Class members' loans, breached the terms of the loans by imposing Improper Late Fees. PHH, acting on its own behalf or on behalf of the assignees, investors, and/or owners of such loans, has asserted, and will continue to assert, that these Improper Late Fees are amounts due and owing pursuant to the terms of Plaintiff's and Late Fee Class members' loans, and that these debts are valid. As such, PHH has collected, and will continue to collect (or attempt to collect) these Improper Late Fees through mortgage servicing, debt collection activities, foreclosures (and deficiency judgments), claims in bankruptcy proceedings, etc.

29.     Because of the claims for Improper Late Fees, some Late Fee Class members reasonably believed that they were required to pay the Improper Late Fees, and, as a result, paid

those Improper Late Fees (either directly or indirectly) as part of reinstatement, payoff refinancing their loans, by accepting a loan modification, in foreclosure, or in bankruptcy proceedings. These payments were made under the mistaken belief that the Improper Late Fees were, in fact, proper. These payments were also paid under duress. Indeed, any reasonable borrower would feel compelled to pay the Improper Late Fees when faced with a choice between (1) paying the Improper Late Fees—a relatively small amount of money in comparison to the outstanding balance of his/her loan—to reinstate his/her loan, or (2) permanently losing his/her home through foreclosure.

### *RESPA and Regulation X*

30.    Congress enacted RESPA, in part, to ensure "that consumers throughout the nation are provided with greater and timelier information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). Since "Congress intended RESPA to serve consumer-protection purposes[,] RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (citations omitted).

31.    RESPA was amended through the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—in part to add 12 U.S.C. § 2605(k) which imposed further obligations on servicers.

32.    As amended, it is a violation of RESPA for a servicer to "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties." 12 U.S.C. § 2605(k)(1)(C).

33.     Further, RESPA, as amended, requires servicers to respond to inquiries from borrowers seeking the identity and contact information of the owner or assignee of borrowers' mortgage loans within ten (10) business days. 12 U.S.C. § 2605(k)(1)(D).

34.     In January 2013, pursuant to the authority granted by the Dodd-Frank Wall Street Reform and Consumer Protection Act—Public Law No. 111-203, 124 Stat. 1376 (2010)—the Consumer Finance Protection Bureau ("CFPB") issued a number of final rules concerning mortgage markets in the United States—known as "Regulation X" and codified as 12 C.F.R. § 1024.1, *et seq.* Regulation X became effective on January 10, 2014.

35.     Regulation X further expanded servicers' obligations under RESPA because RESPA, as amended, makes it unlawful for a servicer to "fail to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter." 12 U.S.C. § 2605(k)(1)(E).

36.     Regulation X also imposed requirements upon servicers in responding to two new categories of correspondence from borrowers related to their mortgage loans; specifically, Requests for Information ("RFIs") and Notices of Error ("NOEs"). "The CFPB has made this clear in its official interpretation of the regulations: 'A qualified written request is just one form that a written notice of error or information request may take. Thus, the error resolution and information request requirements in §§ 1024.35 and 1024.36 apply as set forth in those sections irrespective of whether the servicer receives a qualified written request.' 12 C.F.R. § 1024, Supp. I." *E.g., Messina v. Green Tree Servicing, LLC,* 210 F.Supp.3d 992, 1007 (N.D. Ill. 2016).

37.     Relative to RFIs, Regulation X provides that "a servicer shall comply with the requirements of this section for any written request for information from a borrower that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage

loan account, and states the information the borrower is requesting with respect to the borrower's mortgage loan." 12 C.F.R. § 1024.36(a).

38.    12 C.F.R. § 1024.36(d)(1) provides that a servicer must respond to an RFI by either "[p]roviding the borrower with the requested information and contact information, including a telephone number, for further assistance in writing" or "[c]onducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance."

39.    12 C.F.R. § 1024.36(d)(2)(i)(A) provides that a servicer must respond to an RFI requesting the "identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan" "not later than 10 days (excluding legal public holidays, Saturdays, and Sundays)" after receipt.

40.    The CFPB issued Official Interpretations to Regulation X, Supplement I to Part 1024 (the "Interpretations"). In relation to requests seeking the "identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan", the CFPB issued the following interpretation expressly providing the requirements for a proper response:

> 2.  Owner or assignee of a mortgage loan.
>
>     i.  When a loan is not held in a trust for which an appointed trustee receives payments on behalf of the trust, a servicer complies with § 1024.36(d) by responding to a request for information regarding the owner or assignee of a mortgage loan by identifying the person on whose behalf the servicer receives payments from the borrower. A servicer is not the owner or assignee for purposes of § 1024.36(d) if the servicer holds title to the loan, or title is assigned to the servicer, solely for the administrative convenience of the servicer in servicing the mortgage loan obligation. The

Government National Mortgage Association is not the owner or assignee for purposes of such requests for information solely as a result of its role as the guarantor of the security in which the loan serves as the collateral.

ii. When the loan is held in a trust for which an appointed trustee receives payments on behalf of the trust, *a servicer complies with § 1024.36(d) by responding to a borrower's request for information regarding the owner, assignee, or trust of the mortgage loan with the following information, as applicable*:

A. For any request for information where the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation is not the owner of the loan or the trustee of the securitization trust in which the loan is held: *The name of the trust, and the name, address, and appropriate contact information for the trustee. Assume, for example, a mortgage loan is owned by Mortgage Loan Trust, Series ABC-1, for which XYZ Trust Company is the trustee. The servicer complies with § 1024.36(d) by identifying the owner as Mortgage Loan Trust, Series ABC-1, and providing the name, address, and appropriate contact information for XYZ Trust Company as the trustee.*

B. If the request for information did not expressly request the name or number of the trust or pool and the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation is the owner of the loan or the trustee of the securitization trust in which the loan is held: The name and contact information for the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, as applicable, without also providing the name of the trust.

C. If the request for information did expressly request the name or number of the trust or pool and the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation is the owner of the loan or the trustee of the securitization trust in which the loan is held: *The name of the trust, and the name, address, and appropriate contact information for the trustee, as in comment 36(a)-2.ii.A above.*

Supplement I to Part 1024 (emphasis added).

41.     Importantly, unlike "qualified written requests" submitted pursuant to 12 U.S.C. § 2605(e), RFIs do not need to relate directly to "servicing" to trigger the duties under Regulation X. The CFPB specifically addressed the "servicing" issue in its commentary on 12 C.F.R. § 1024.36(f): "While the final rule does not require that servicers undertake the information request procedures in § 1024.36(c) and (d) for oral submissions, *it does not limit information requests to those related to servicing.*" 78 F.R. 10696, 10761 (emphasis added). Therefore, a servicer is required to respond to "any written request for information," and the scope of 12 C.F.R. § 1024.36(a) is not limited to "requests relating to servicing." *E.g., Pollack v. Seterus, Inc.*, Civil Action No. 17-60475-Civ, 2017 U.S. Dist. LEXIS 202827, at *8-9 (S.D. Fla. Dec. 7, 2017); *St. Claire v. Ditech Fin. LLC*, No. 1:17-CV-03370-AT-JFK, 2018 U.S. Dist. LEXIS 219661, at *11 (N.D. Ga. Sept. 21, 2018).

42.     Relative to NOEs, Regulation X provides that "[a] servicer shall comply with the requirements of this section for any written notice from the borrower that asserts an error and that includes the name of the borrower, information that enables the servicer to identify the borrower's mortgage loan account, and the error the borrower believes has occurred." 12 C.F.R. § 1024.35(a).

43.     12 C.F.R. § 1024.35(e)(1) provides that a servicer must respond to an NOE by either "[c]orrecting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a phone number, for further assistance" or "[c]onducting a reasonable investigation and providing the borrower with written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its

determination, information regarding how the borrower can request such documents, and contact information, including a phone number, for further assistance."

### Plaintiff's and RESPA Class Members' Loans

44.     PHH is a mortgage "servicer" as that term is defined by 12 C.F.R. § 1024.2(b) and 12 U.S.C. § 2605(k). PHH is the current servicer of Plaintiff's and RESPA Class (defined *infra*) members' loans.

45.     Plaintiff's and RESPA Class members' loans are each a "federally related mortgage loan" as defined by RESPA and Regulation X. 12 U.S.C. § 2602(1); 12 C.F.R. § 1024.2(b).

46.     PHH is subject to the requirements of RESPA and Regulation X and does not qualify for the exceptions for "small servicers"—as defined by 12 C.F.R. § 1026.41(e)(4)—or "qualified lender[s]"—as defined by 12 C.F.R. § 617.7000.

47.     At all times relevant, Plaintiff's and RESPA Class members' loans were owned or held by securitized trusts ("Trusts") which were the *actual* owners or assignees of their loans.

48.     Plaintiff and RESPA Class members each submitted one or more requests—as defined by 1024.36(a) and/or otherwise falling within the purview of 12 U.S.C. §§ 2605(k)(1)— seeking the identity and contact information of the owner or assignee of their loans from PHH (the "Inquiries").

49.     Plaintiff and RESPA Class members each submitted their Inquiries to PHH at the address, email address, and/or facsimile number PHH designated for receipt of NOEs and RFIs, pursuant to 12 C.F.R. § 1024.35(c) and 12 C.F.R. § 1024.36(d), respectively (the "Designated Address").

50.     As noted above, RESPA, Regulation X, and the Official Interpretations required PHH to identify the *owner* of Plaintiff's and RESPA Class members' loans—*i.e.*, the Trusts—by name in response to the Inquiries.

51.     However, PHH failed to properly and fully identify the *owner* of Plaintiff's and RESPA Class members' loans—*i.e.*, the Trusts—in response to the Inquiries as expressly required by RESPA, Regulation X, and the Official Interpretations. Specifically, in response to each of the Inquiries, PHH provided Plaintiff and RESPA Class members with the name and contact information for the entity that acted as the "trustee" of the Trust but failed to identify the Trust itself.

52.     Therefore, PHH failed to provide adequate written responses to Plaintiff's and RESPA Class members' Inquiries as required by 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1)(D).

53.     As a result of PHH's failure to comply with RESPA and Regulation X, Plaintiff and RESPA Class members were each harmed because they incurred the expenses associated with sending their Inquiries—such as their time, postage, etc.—but they did not receive the information to which they were legally entitled under RESPA and Regulation X. Indeed, because PHH "failed to do that which it was obligated to do [under RESPA]" the time and expense associated with Plaintiff's and RESPA Class members' submission of the Inquiries to PHH "metamorphosed into damages." *Marais v. Chase Home Fin., LLC*, 24 F.Supp.3d 712, 728 (S.D. Ohio 2014); *Justice v. Ocwen Loan Servicing*, 2015 WL 235738, at *19 (S.D. Ohio 2015); *McMillen v. Resurgent Capital Services, L.P.*, 2015 WL 5308236, at *10 (S.D. Ohio 2015); *Dale v. Selene Fin. LP*, 2016 WL 6024580, at *3 (N.D. Ohio 2016).

54.     Subsequently, Plaintiff and certain RESPA Class members—*i.e.*, members of the NOE Subclass (defined below)—sent NOEs to PHH concerning PHH's insufficient responses to their initial Inquiries.

55.     Had PHH adequately responded to Plaintiff's and NOE Subclass members' Inquiries, Plaintiff and NOE Subclass members would not have needed to send NOEs regarding PHH's failure to comply with its obligations under RESPA and Regulation X. As such, Plaintiff and NOE Subclass members were further harmed by PHH's failure to adequately respond to their Inquiries, as it required them to incur the expenses associated with sending these subsequent NOEs—such as their time, postage, etc.

56.     PHH's practice of failing to provide substantive responses to Inquiries is part of a sustained pattern and practice of noncompliance with RESPA and Regulation X. Indeed, PHH's response to Plaintiff's Inquiry (defined *infra*) appears to be part of a form letter used for all similarly situated borrowers. For example, Plaintiff's counsel has received several of these insufficient responses from PHH relative to other clients of Plaintiff's counsel during the past year. Specifically, Plaintiff's counsel has received insufficient responses from PHH and sent NOEs regarding the same to PHH for at least four (4) clients with mortgaged properties in the state of Ohio and at least three (3) clients with mortgaged properties in the state of New Jersey.

57.     Because many homeowners sending Inquiries are involved in defending against foreclosure or are seeking information related to available loss mitigation options, this conduct is extremely detrimental as it deprives these homeowners from having full knowledge of the entity to whom their obligations are ultimately owed or the loss mitigation options to which they would be eligible for review.

58.     Plaintiff and RESPA Class members are asserting claims for relief against PHH for breach of the duties owed to them, pursuant to 12 U.S.C. §§ 2605(k)(1) and 12 C.F.R. § 1024.36.

59.     Plaintiff and RESPA Class members have a private right of action, pursuant to 12 U.S.C. § 2605(f), for the claimed breaches, and RESPA provides for remedies including actual damages, costs, statutory damages, and attorneys' fees.

## FACTS RELEVANT TO PLAINTIFF

### *As Related to the Late Fee Class*

60.     On July 29, 2005, Plaintiff entered a mortgage loan with non-party Ameriquest Mortgage Company, which was secured by a mortgage on Plaintiff's principal place of residence. *See*, Plaintiff's Note, ¶ 1; *see generally*, Plaintiff's Mortgage. The terms of that loan were subsequently modified via an agreement between Plaintiff and non-party American Home Mortgage Servicing, Inc. *See*, Loan Modification Agreement and Security Retention Agreement (the "2010 Modification"), attached as **Exhibit 3**.

61.     PHH currently services Plaintiff's loan on behalf of the assignee of Plaintiff's loan, non-party Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-R9 ("Deutsche"), pursuant to a contractual agreement between PHH and Deutsche.

62.     Pursuant to the terms of Plaintiff's loan, Plaintiff was required to make periodic, "monthly payments" of principal and interest in the amount dictated by the step-rate payment schedule in the 2010 Modification until the entire balance was paid in full. *See*, Plaintiff's Note, ¶ 3; *see also*, the 2010 Modification, ¶ 4. Each of Plaintiff's "monthly payments" was due on the first day of each month beginning on October 1, 2005. *See*, Plaintiff's Note, ¶ 3(B).

63.     Plaintiff's loan further provided that if any "monthly payment" was not paid within 15 days after becoming due, Plaintiff would be required to pay a "late charge" in the amount of 5.000% of the overdue "monthly payment" amount—that is, $39.56 as of October 1, 2017. *See*, Plaintiff's Note, ¶ 6(A); *see also*, the 2010 Modification, ¶ 4.

64.     Pursuant to the terms of Plaintiff's loan, if Plaintiff failed to timely make each required "monthly payment," Plaintiff would be in default on the loan. *See*, Plaintiff's Note, ¶ 6(B). Plaintiff's loan further provided that if he were in default, the Note Holder may send Plaintiff written notice that if he did not pay the delinquent balance by a certain date, his loan would be accelerated. *See*, Plaintiff's Note, ¶ 6(C); Plaintiff's Mortgage, ¶ 22.

65.     Plaintiff failed to make his "monthly payments" on his loan in January 2019 and thereafter. As such, Plaintiff was in default on his loan beginning on January 1, 2019. *See*, Plaintiff's Note, ¶ 6(B) (stating that if Plaintiff "do[es] not pay the full amount of each monthly payment on the date it is due, [Plaintiff] will be in default").

66.     The prior servicer of Plaintiff's loan, Ocwen Loan Servicing, LLC ("Ocwen") subsequently sent Plaintiff correspondence dated February 27, 2019 stating that Plaintiff was in default on his loan, and that he was required to pay the delinquent balance, plus "late charges," by a specified "Cure Date"—April 5, 2019 (the "Default Letter"). *See*, the Default Letter, attached as **Exhibit 4**.

67.     The Default Letter also stated that Plaintiff's failure to pay the delinquent balance, plus "late charges," by the Cure Date may result in acceleration of Plaintiff's loan and the commencement of foreclosure proceedings. *See*, Exhibit 4.

68.     Plaintiff did not make any further payments on his loan after receiving the Default Letter, and the assignee, investor, owner and/or servicer of Plaintiff's loan accelerated Plaintiff's loan.

69.     Servicing rights to Plaintiff's loan transferred from Ocwen to PHH effective June 1, 2019. Plaintiff's loan was in default at the time servicing rights transferred to PHH.

70.     On or about November 12, 2019, the assignee of Plaintiff's loan, Deutsche filed a foreclosure action against Plaintiff in the Lorain Court of Common Pleas captioned *Deutsche Bank Nat'l Trust Co. v. Michael F. Abfall, et al.*, Case No. 19CV199815 (the "Foreclosure Action").

71.     Based on the plain terms of Plaintiff's loan, Plaintiff was no longer required to make "monthly payments" on his loan after it was accelerated. *Compare Plaintiff's Note*, ¶ 6(C) (describing Plaintiff's payment obligations after acceleration) *with* Plaintiff's Note, ¶ 3 (describing Plaintiff's "monthly payment" obligations).

72.     PHH obtained servicing rights to Plaintiff's loan when Plaintiff was still in default, meaning that Plaintiff had no obligation to make "monthly payments" under the terms of his loan. Therefore, PHH—acting on behalf of Deutsche—had no right to collect "monthly payments" from Plaintiff relative to his loan upon obtaining servicing rights to his loan.

73.     As noted *supra*, Plaintiff's loan only authorized the imposition of "late charges" in the event that Plaintiff failed to make a required "monthly payment." *See*, Plaintiff's Note, ¶ 6(A). Because Plaintiff's obligation to make "monthly payments" on his loan ceased after it was accelerated, PHH—acting on behalf of Deutsche—had no authority to impose "late charges" against Plaintiff.

74.     On October 14, 2020, PHH—acting on behalf of Deutsche—sent Plaintiff a "Loan Payoff Statement" which contained a payoff amount for Plaintiff's loan good through November

12, 2020 in the amount of $51,953.59, including $354.15 in "Unpaid Late Charges". *See*, Plaintiff's Payoff Statement, attached as **Exhibit 5**.

75. On October 22, 2020, PHH provided an itemization of fees imposed against Plaintiff and his loan (the "Fee Itemization") through which PHH identified that in addition to late fees totaling $235.47 that were transferred from the prior servicer, PHH imposed late fees, each in the amount of $39.56 on September 16, 2019, August 17, 2020, and September 16, 2020. *See*, a copy of the Fee Itemization, attached as **Exhibit 6**.

76. The $354.15 in "Unpaid Late Charges" in Plaintiff's Payoff Statement contained the three (3) late fees totaling $118.68 that PHH imposed after obtaining servicing rights to Plaintiff's loan.

77. Based on the plain terms of Plaintiff's loan, since PHH obtained servicing rights to Plaintiff's loan when it was in default and it had remained in default as of PHH's sending of Plaintiff's Payoff Statement, PHH had no authority to impose any of these late fees totaling $118.68.

78. Plaintiff and Deutsche entered into a "LOAN MODIFICATION AGREEMENT" effective January 1, 2021 (the "2021 Modification"). *See*, a copy of the executed Modification, attached as **Exhibit 7**.

79. Per the terms of the 2021 Modification, "Unpaid Amounts" totaling $10,317.11 were capitalized onto the unpaid principal balance of Plaintiff's loan with the modified principal balance of the loan totaling $49,370.47. *See*, Exhibit 7.

80. PHH did not provide any explanation as to the breakdown of the amounts comprising the "Unpaid Amounts." *See*, Exhibit 7. However, as explained below, and on information and belief, these "Unpaid Amounts" consisted, in part, of Improper Late Fees.

81.     PHH sent Plaintiff a periodic billing statement for the loan for the payment due April 1, 2021 (the "Mortgage Statement"). *See*, a copy of the Mortgage Statement, attached as **Exhibit 8**.

82.     The Mortgage Statement identified the transactions posted to Plaintiff's loan from February 26, 2021 through March 9, 2021, which included the transactions for the onboarding of the 2021 Modification. *See*, Exhibit 8.

83.     As reflected on the Mortgage Statement (Exhibit 8), on March 8, 2021, a number of transactions were posted to Plaintiff's loan representing the onboarding of the 2021 Modification and reflecting the amounts capitalized onto the unpaid principal balance of the loan through the 2021 Modification which specifically included $354.15 in "Fees & Shortages", which equals the amount claimed to be due and owing for "Unpaid Late Charges" in the Payoff Statement, and which included the amount due and owing for three (3) Improper Late Fees.

84.     In total, PHH imposed at least three (3) Improper Late Fees to Plaintiff's loan and capitalized each of these Improper Late Fees onto the modified principal balance of his loan upon which he will incur and need to pay interest at a rate of 2.875%.

85.     That is, not only has PHH effectively charged Plaintiff for $118.68 in Improper Late Fees, but PHH has done so in such a manner to force Plaintiff to pay interest on the Improper Late Fees.

86.     Upon PHH's onboarding of the 2021 Modification on or about March 8, 2021, the default on Plaintiff's loan was cured and the Foreclosure Action was dismissed on or about April 1, 2021.

## *As Related to the RESPA Class*

87.    Plaintiff's loan is owned by or is otherwise a part of a mortgage-backed security (*i.e.*, a Trust) named Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2006-R9 ("Ameriquest"). Ameriquest is the Trust that is the actual owner or investor of Plaintiff's loan.

88.    Plaintiff, through counsel, sent an Inquiry dated September 23, 2020 to PHH via certified mail to the Designated Address (the "Abfall Inquiry"). *See*, the Abfall Inquiry, attached as **Exhibit 9**. The Abfall Inquiry contained a request for the "identity, address, and other relevant contact information about the owner or assignee of the loan" as contemplated by 12 U.S.C. § 2605(k)(1)(D) and 12 C.F.R. § 1024.36(d)(2)(i)(A).

89.    On or about October 9, 2020, PHH sent a response (the "Abfall Inquiry Response") to Plaintiff's counsel stating that the "investor details" relative to Plaintiff's loan were:

> Deutsche Bank Ntl Trst Co
> 1761 East St Andrew Place
> Santa Ana, CA 92705
> Phone: 714.2247.6000

*See*, the Abfall Inquiry Response, attached as **Exhibit 10**.

90.    The entity PHH identified as the owner or investor of Plaintiff's loan—"Deutsche Bank Ntl Trst Co"—is not the actual owner or investor of Plaintiff's loan, but rather merely the trustee that collects payment on behalf of the actual owner or investor—Ameriquest.

91.    Accordingly, the Abfall Inquiry Response was insufficient to comply with 12 U.S.C. § 2605(k)(1)(D) and 12 C.F.R. § 1024.36(d), as it failed to identify the Trust on behalf of which "Deutsche Bank Ntl Trst Co" collects payments as expressly required under the Interpretations.

92.     Since Plaintiff did not receive the information requested through the Abfall Inquiry, on November 24, 2020, Plaintiff, through counsel, sent an NOE to PHH via certified mail to the Designated Address (the "Abfall NOE"). *See*, the Abfall NOE, attached as **Exhibit11**.

93.     Plaintiff was harmed by PHH's failure to respond to the Abfall Inquiry because he incurred costs relative to sending the Abfall Inquiry—such as postage and attorneys' fees—but did not receive the information to which he was legally entitled pursuant to RESPA and Regulation X. Indeed, as noted *supra*, when PHH "failed to do that which it was obligated to do [under RESPA]" in response to the Abfall Inquiry, the time and expense associated with Plaintiff's submission of the Abfall Inquiry "metamorphosed into damages." *E.g., Marais*, 24 F.Supp.3d at 728.

94.     Had PHH properly responded to the Abfall Inquiry, Plaintiff would not have needed to send the Abfall NOE to obtain the information to which he was legally entitled.

95.     Plaintiff was therefore also harmed by PHH's failure to respond to the Abfall Inquiry because Plaintiff incurred costs relative to sending the Abfall NOE that he would not otherwise have incurred—such as postage and attorneys' fees—had PHH properly responded to the Abfall Inquiry.

## CLASS ACTION ALLEGATIONS

96.     **Late Fee Class Definition**: Plaintiff brings this action pursuant to Ohio Civ. R. 23 on behalf of a class of similarly situated individuals and entities (the "Late Fee Class"), defined as follows:

> All loan borrowers in United States, during the applicable statute of limitations period, (1) who have mortgage loans secured by residential real property, (2) whose mortgage loans did not provide for the imposition of late fees or charges after acceleration of their mortgage loans, (3) against whom late fees or charges were imposed or demanded after acceleration of their mortgage loans at any time

within six (6) years prior to the filing of this Complaint, and (4) whose mortgage loans were serviced by PHH at any point after their mortgage loans were accelerated.

Excluded from the Late Fee Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Late Fee Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

97.     **FDCPA Subclass Definition**: Plaintiff also brings this action pursuant to Ohio Civ. R. 23 on behalf of a subclass of similarly situated individuals and entities ("the FDCPA Subclass"), defined as follows:

All loan borrowers in United States, during the applicable statute of limitations period, (1) who have mortgage loans secured by residential real property to which PHH acquired servicing rights after the loans were in default, (2) whose mortgage loans did not provide for the imposition of late fees or charges after acceleration of their mortgage loans, (3) whose mortgage loans were serviced by PHH at any point after their mortgage loans were accelerated, and, (4) against whom, within one (1) year prior to the filing of this Complaint, PHH imposed late fees or charges after acceleration of their mortgage loans or demanded such fees or charges be paid

Excluded from the FDCPA Subclass are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the FDCPA Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

98.     **Ohio Subclass Definition:** Plaintiff also brings this action pursuant to Ohio Civ.

R. 23 on behalf of a subclass of similarly situated individuals and entities ("the Ohio Subclass"),

defined as follows:

> All loan borrowers in United States, during the applicable statute of
> limitations period, (1) who have mortgage loans secured by
> residential real property located in the State of Ohio, (2) whose
> mortgage loans did not provide for the imposition of late fees or
> charges after acceleration of their mortgage loans, (3) whose
> mortgage loans were serviced by PHH at any point after their
> mortgage loans were accelerated; and (4) against whom, within two
> (2) years prior to the filing of this Complaint, PHH imposed late fees
> or charges after acceleration of their mortgage loans or demanded
> such fees or charges be paid.

> Excluded from the Ohio Subclass are: (1) Defendant, Defendant's
> agents, subsidiaries, parents, successors, predecessors, and any
> entity in which Defendant or their parents have a controlling
> interest, and those entities' current and former employees, officers,
> and directors; (2) the Judge to whom this case is assigned and the
> Judge's immediate family; (3) any person who executes and files a
> timely request for exclusion from the Ohio Subclass; (4) any persons
> who have had their claims in this matter finally adjudicated and/or
> otherwise released; and (5) the legal representatives, successors and
> assigns of any such excluded person.

99.     **RESPA Class Definition:** Plaintiff brings this action pursuant to Ohio Civ. R. 23

on behalf of a class of similarly situated individuals and entities (the "RESPA Class"), defined as

follows:

> All loan borrowers in the United States (1) who have loans for which
> a securitized trust or pool is the owner or investor, (2) whose loans
> are serviced by PHH, (3) who submitted to PHH an Inquiry seeking
> the information about the owner or assignee of their loans which
> PHH received within three (3) years preceding the filing of this
> Complaint, and (4) to whom PHH did not identify the securitized
> trust or pool that was the owner of their loans in response to such
> Inquiry.

> Excluded from the RESPA Class are: (1) Defendant, Defendant's
> agents, subsidiaries, parents, successors, predecessors, and any
> entity in which Defendant or its parents have a controlling interest,
> and those entities' current and former employees, officers, and

directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the RESPA Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; (5) the legal representatives, successors and assigns of any such excluded person; and (6) any person whose Inquiry did not expressly request the name or number of the securitized trust or pool, *and* the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation was the owner of the loan or the trustee of the securitization trust in which the loan was held.

100. **NOE Subclass Definition**: Plaintiff also brings this action pursuant Ohio Civ. R. 23 on behalf of a subclass of similarly situated individuals and entities (the "NOE Subclass"), defined as follows:

All loan borrowers in the United States (1) who have loans for which a securitized trust or pool is the owner or investor, (2) whose loans are serviced by PHH, (3) who submitted to PHH an Inquiry seeking the information about the owner or assignee of their loans which PHH received within three (3) years preceding the filing of this Complaint, (4) to whom PHH did not identify the securitized trust or pool that was the owner of their loans in response to such Inquiry, and (5) who sent an NOE to PHH regarding PHH's response to their Inquiry.

Excluded from the NOE Subclass are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the NOE Subclass; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; (5) the legal representatives, successors and assigns of any such excluded person; and (6) any person whose Inquiry did not expressly request the name or number of the securitized trust or pool, *and* the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation was the owner of the loan or the trustee of the securitization trust in which the loan was held.

101. **Numerosity and Ascertainability**: Upon information and belief, the Late Fee Class and the RESPA Class (collectively, the "Classes") are each comprised of more than forty

(40) members, such that the Classes are so numerous that joinder of all members is impractical. This conclusion is reasonable because as of March 31, 2020, Ocwen, the parent company of PHH, "serviced approximately $200 billion in unpaid principal balance ("UPB") of forward residential mortgages." Moreover, due to the availability of mortgage-related assistance through the CARES Act and similar programs arising out of the COVID-19 pandemic depending primarily upon the owner or investor of borrowers' individual loans, it is expected that a higher percentage of borrowers than would be typical are seeking information as to the owner or investor of their loans through their mortgage loan services. The exact number of members in the Classes is presently unknown and can only be ascertained through discovery. Class members can easily be identified through Defendant's records or by other means.

102. **Commonality and Predominance:** There are questions of law and fact common to the proposed Classes that predominate over any individual questions. As to the Late Fee Class, simply put, Defendant imposed Improper Late Fees against Plaintiff and Late Fee Class members, and Plaintiff and Late Fee Class members were harmed as a result. Similarly, all members of the RESPA Class have been subject to and affected by a uniform course of conduct; specifically, PHH refusing or otherwise failing to provide a proper response to borrowers' Inquiries by failing to identify the securitized trust or pool that is the owner or investor of their loans. There are questions of law and fact common to each of the proposed Classes that predominate over any individual questions, including:

      a. Whether the terms of Plaintiff's and Late Fee Class members' loans permitted PPH to impose late fees after their loans were accelerated;

      b. Whether the late fees imposed by PHH against Plaintiff and Late Fee Class members were proper;

c.   Whether PHH's imposition of Improper Late Fees amounted to a breach of contract;

d.   Whether PHH's imposition or demand of Improper Late Fees violated the FDCPA;

e.   Whether PHH's imposition or demand of Improper Late Fees violated the RMLA;

f.   Whether PHH's responses to Plaintiff's and RESPA Class members' Inquiries failed to comply with the requirements of RESPA and Regulation X;

g.   Whether PHH's failures to properly respond to Plaintiff's and RESPA Class members' Inquiries were part of a sustained pattern and practice of noncompliance with RESPA and Regulation X;

h.   Whether Plaintiff and members of the Classes and Subclasses suffered actual damages, and the measure and amount of those damages; and,

i.   Whether Plaintiff and members of the Classes and Subclasses are entitled to recover statutory damages and/or punitive damages, as well as their attorneys' fees and costs incurred in connection with this action.

103.   **Typicality**: Plaintiff's claims are typical of the claims of the Classes and related subclasses. Plaintiff's and Late Fee Class members' loans contain substantially similar language, as they were drafted using standardized templates or uniform instruments common to all loans and are intended or planned to be assigned to, or subsequently owned by, government sponsored entities such as Fannie Mae or Freddie Mac, or contain substantially similar language to such documents. As such, Plaintiff, Late Fee Class members, and FDCPA Subclass members were subjected to and affected by a uniform course of conduct; specifically, Defendant's imposition and

demand for payment of Improper Late Fees. Plaintiff, RESPA Class members, and NOE Subclass members were denied a substantive response to which they were entitled because Defendant unlawfully failed to identify the *owner* of Plaintiff's and RESPA Class members' loans—*i.e.*, the Trusts—by name, and Plaintiff and RESPA Class members incurred damages as a result.

104.    **Adequacy**: Plaintiff will adequately represent the interests of the Classes and Subclasses. Plaintiff does not have adverse interests to the Classes or Subclasses. Plaintiff's counsel has extensive experience litigating consumer class actions.

105.    **Superiority**: A class action is the superior method for the quick and efficient adjudication of this controversy since joinder of all members is impracticable. While the economic damages suffered by the individual members of the Classes and Subclasses are significant, the amount is modest compared to the expense and burden of individual litigation. The question of law or fact common to the members of the Classes and Subclasses predominate over any question affecting only individual members. A class action will cause an orderly and expeditious administration of the claims of the Classes and Subclasses, and will foster economies of time, effort, and expense. Given the relatively small amount of damages available to Plaintiff and members of the Classes and Subclasses, adjudication on a classwide basis would provide members of the Classes with a remedy that they may be unlikely to pursue individually. Plaintiff does not anticipate any difficulty in the management of this litigation.

<div align="center">

**COUNT I**
**Declaratory Judgment**
**(Ohio Rev. Code §§ 2701, *et seq.*)**
**(On behalf of Plaintiff and the Late Fee Class)**

</div>

106.    Plaintiff repeats and realleges paragraphs 1 through 105 with the same force and effect as though fully set forth herein.

107.    "[C]ourts of record may declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding is open to objection on the ground that a declaratory judgment or decree is prayed for under this chapter. The declaration may be either affirmative or negative in form and effect. The declaration has the effect of a final judgment or decree." Ohio Rev. Code § 2721.02.

108.    "[A]ny person interested under a deed, will, written contract, or other writing constituting a contract...may have determined any question of construction or validity arising under the instrument, constitutional provision, statute, rule, ordinance, resolution, contract, or franchise and obtain a declaration of rights, status, or other legal relations under it." Ohio Rev. Code § 2721.03.

109.    Plaintiff, individually, and on behalf of the Late Fee Class, seeks an order declaring that Plaintiff's and Late Fee Class members' loans do *not* authorize the imposition of late fees after acceleration.

110.    The controversies presented in this case are definite and concrete and affect the adverse legal interests of the parties. Plaintiff and Late Fee Class members contend that, pursuant to the terms of their loans, Defendant is legally unable to impose late fees after acceleration. In contrast, Defendant has repeatedly contended that it may legally impose Improper Late Fees. Accordingly, this case will determine the legal scope of Defendant's obligations to Plaintiff and Late Fee Class members.

111.    There is an actual controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment because Defendant has imposed, and will continue to impose, Improper Late Fees. Defendant has sent Plaintiff and Late Fee Class members payoff statements and monthly statements indicating its intent to collect these amounts and has

Case: 1:21-cv-01414-DAP Doc #: 1-1 Filed: 07/22/21 31 of 122. PageID #: 36

sought to collect these amounts through foreclosure proceedings, bankruptcy proceedings, and through other methods. Notwithstanding Defendant's attempt to collect these Improper Late Fees, Plaintiff and members of the Late Fee Class assert that they have no legal obligation to pay them because they are unauthorized pursuant to the terms of their loans.

112.   If the Court were to deny Plaintiff's and Late Fee Class members' request for declaratory relief, this controversy will continue to exist, as Defendant will continue to attempt to collect Improper Late Fees—whether through reinstatement, refinancing, loan modifications, foreclosure, during bankruptcy proceedings, etc.—and Plaintiff and Late Fee Class members will continue to assert that these amounts are unauthorized pursuant to the terms of their loans. As such, the resolution of this controversy is contingent upon the declaration requested herein, and because Defendant refuses to fulfill its legal obligations to Plaintiff and the Late Fee Class.

113.   Based on the foregoing facts, the Court should declare the rights and other legal remedies pursuant to the terms of Plaintiff's and Late Fee Class members' loans.

## COUNT II
### Breach of Contract
### (On behalf of Plaintiff and the Late Fee Class)

114.   Plaintiff repeats and realleges paragraphs 1 through 105 with the same force and effect as though fully set forth herein.

115.   Plaintiff's and Late Fee Class members' loans are legally binding and enforceable contracts with PHH.

116.   Pursuant to the terms of Plaintiff's and Late Fee Class members' loans, PHH is not authorized to impose late fees after acceleration of those loans.

117.    In breach of its contractual obligations under the terms of Plaintiff's and Late Fee Class members' loans, PHH imposed Improper Late Fees against Plaintiff and Late Fee Class members.

118.    Plaintiff and Late Fee Class members have been harmed by PHH's breach, as they have already paid, or are currently obligatd to pay, the Improper Late Fees in connection with reinstatement, refinancing, loan modifications, foreclosure, during bankruptcy proceedings, etc.

### COUNT III
### Violation of the FDCPA, 15 U.S.C. §§ 1692e and 1692f
### (On behalf of Plaintiff and the FDCPA Subclass)

119.    Plaintiff repeats and realleges paragraphs 1 through 105 with the same force and effect as though fully set forth herein.

120.    The FDCPA makes it an illegal, "unfair practice" for a debt collector to undertake "the collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." 15 U.S.C. § 1692f(1).

121.    "The [FDCPA] is an extraordinarily broad statute and must be construed accordingly" so it would be anomalous to conclude that "any amount" fails to encompass the Improper Late Fees. *See, Stratton v. Portfolio Recovery Assocs, LLC*, 770 F.3d 443, 449 (6th Cir. 2014) (internal citations omitted).

122.    The Improper Late Fees that PHH has imposed against, collected, or attempted to collect from Plaintiff and FDCPA Subclass members are not authorized by the terms of their loans or otherwise by law.

123.    As the Improper Late Fees imposed against the FDCPA Class members and their loans are not authorized by the contract or any provision of law, their imposition, collection, or

attempted collection within the one (1) year preceding the filing of this Complaint violates 15 U.S.C. § 1692f.

124.    The FDCPA makes it illegal for a debt collector to misrepresent "the character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2).

125.    By demanding the Improper Late Fees through periodic billing statements, payoff statements, and other means within the one (1) year preceding the filing of this Complaint, PHH has misrepresented the amounts due and owing in relation to Plaintiff's and the FDCPA Subclass members' loans in violation of 15 U.S.C. § 1692f.

126.    As a result of PHH's actions, PHH is liable to Plaintiff and FDCPA Subclass members for actual damages, statutory damages, costs, and attorneys' fees. 15 U.S.C. § 1692k.

## COUNT IV
### Violation of the RMLA, R.C. 1322.01, *et seq.*
### (On behalf of Plaintiff and the Ohio Subclass)

127.    Plaintiff repeats and realleges paragraphs 1 through 105 with the same force and effect as though fully set forth herein.

128.    "No person ... shall act as a ... mortgage servicer ... without first having obtained a certificate of registration from the superintendent of financial institutions for the principal office and every branch office to be maintained by the person for the transaction of business as a ... mortgage servicer ... in this state." R.C. 1322.07(A).

129.    PHH, as a mortgage servicer, is required to be registered with the Ohio Department of Commerce, Division of Financial Institutions under R.C. 1322.

130.    PHH is a registrant under R.C. 1322, as the Ohio Department of Commerce, Division of Financial Institutions has issued it certificates of registration, License Nos.

RM.804016.000, RM.804016.016-BR, RM.804016.018-BR, RM.804016.021-BR, RM.804016.024-BR, and RM.804016.025-BR. R.C. 1322.01(GG).

131. PHH's conduct, in imposing, collecting, or otherwise demanding payment of and attempting to collect the Improper Late Fees, is in violation of R.C. 1322.40(C) as it is conduct that constitutes improper, fraudulent, or dishonest dealings.

132. PHH's conduct caused Plaintiff and Ohio Subclass members to suffer actual damages, as further described, *supra*.

133. As a result of PHH's conduct, PHH is liable to Plaintiff and Ohio Subclass members for actual damages, as further described, *supra*, reasonable attorneys' fees and costs incurred in connection with this action, and punitive damages. R.C. 1322.52.

134. A registrant, licensee, or person required to be registered or licensed under R.C. 1322, *et seq.*, is required to comply with all duties imposed by other statutes or common law and:

> (3) Act with reasonable skill, care, and diligence; [and]
>
> (4) Act in good faith and with fair dealing in any transaction, practice, or course of business in connection with the brokering or originating of any residential mortgage loan[.]

R.C. 1322.45(A).

135. A registrant, licensee, or person required to be registered or licensed under R.C. 1322 cannot waive or modify its duties under R.C. 1322.45(A). R.C. 1322.45(C).

136. PHH's conduct, in imposing, collecting, or otherwise demanding payment of and attempting to collect the Improper Late Fees, is in violation of R.C. 1322.45(A)(3)-(4).

137. As a result of PHH's conduct, PHH is liable to Plaintiff and Ohio Subclass members for actual damages, as further described, *supra*, reasonable attorneys' fees and costs incurred in connection with this action, and punitive damages. R.C. 1322.45(D).

## COUNT V
### (Violations of 12 U.S.C. §§ 2605(k)(1)(C) and (E), and 12 C.F.R. § 1024.36)
### (On behalf of Plaintiff, the RESPA Class, and the NOE Subclass)

138.    Plaintiff repeats and realleges paragraphs 1 through 105 with the same force and effect as though fully set forth herein.

139.    Plaintiff and RESPA Class members submitted Inquiries to PHH at the Designated Address.

140.    Plaintiff's and RESPA Class members' Inquiries requested specific information related to their loans, specifically, the identity and contact information of the owner or assignee of their loans from PHH, as contemplated by, *inter alia*, 12 C.F.R. § 1024.36 and/or 12 U.S.C. § 2605(k)(1).

141.    PHH failed to properly, or otherwise fully, identify the owner of Plaintiff's and RESPA Class members' loans in response to the Inquiries as expressly required by RESPA, Regulation X, and the Interpretations. Specifically, in response to each of the Inquiries, PHH provided the name and contact information for the entity that acted as the "trustee" of the Trust that was the *actual* owner or assignee of the loan, but failed to identify the Trust itself by name.

142.    PHH failed to provide an adequate written response to Plaintiff's and RESPA Class members' Inquiries within ten (10) business days of receipt at the Designated Address—as required by 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1).

143.    PHH's failure to provide appropriate responses to Plaintiff's and RESPA Class members' Inquiries within ten (10) business days of receipt constitutes a clear violation of the requirements of 12 C.F.R. § 1024.36 and 12 U.S.C. § 2605(k)(1).

144.    Plaintiff and RESPA Class members were harmed because they incurred the expenses associated with sending Inquiries—such as their time, postage, etc.—but did not receive

the information or responses to which they were legally entitled, pursuant to RESPA and Regulation X.

145.    Plaintiff and NOE Subclass members were further harmed by PHH's failure to appropriately respond to the Inquiries because they each incurred costs relative to sending an NOE that they would not otherwise have incurred—such as postage and attorneys' fees—had PHH properly responded to their Inquiries.

146.    PHH is evading its legal obligations and has effectively stripped borrowers of their right to submit Inquiries within and subject to the protective framework of RESPA, as PHH engaged in a pattern and practice of behavior of providing incomplete, evasive, or inaccurate information in response to such Inquiries.

147.    PHH's actions are in continuation of a pattern and practice of behavior in conscious disregard of the Plaintiff's and RESPA Class members' rights.

148.    As a result of PHH's actions, PHH is liable to Plaintiff and RESPA Class members for actual damages, statutory damages, costs, and attorneys' fees. 12 U.S.C. §§ 2605(f)(2)-(3).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Michael F. Abfall, individually, and on behalf of all others similarly situated, prays for an Order as follows:

A.  Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Late Fee Class, the FDCPA Subclass, the Ohio Subclass, the RESPA Class, and the NOE Subclass, each as defined, *supra*;

B.  Designating Plaintiff as representative of the Late Fee Class, the FDCPA Subclass, the Ohio Subclass, the RESPA Class, and the NOE Subclass, and his undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiff, the Late Fee Class, the FDCPA Subclass, the Ohio Subclass, the RESPA Class, and the NOE Subclass and against Defendant;

D. Awarding Plaintiff, the Late Fee Class, the FDCPA Subclass, the Ohio Subclass, the RESPA Class, and the NOE Subclass their actual damages;

E. Awarding Plaintiff and the FDCPA Subclass their statutory damages as allowed under the FDCPA;

F. Awarding Plaintiff and the Ohio Subclass punitive damages as allowed under the RMLA;

G. Awarding Plaintiff, the RESPA Class, and the NOE Subclass their statutory damages as allowed under RESPA;

H. Awarding Plaintiff, the Late Fee Class, the FDCPA Subclass, the Ohio Subclass, the RESPA Class, and the NOE Subclass attorneys' fees and costs, including interest thereon, as allowed or required by law; and,

I. Granting all such further and other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: July 19, 2021

Respectfully submitted,

Marc E. Dann (Ohio Bar No. 0039425)
Daniel M. Solar (Ohio Bar No. 0085632)
Brian D. Flick (Ohio Bar No. 0081605)
DANNLAW
P.O. Box 6031040
Cleveland, OH 44103
Telephone: (216) 373-0539
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
tom@attorneyzim.com
Matthew C. De Re (*pro hac vice* anticipated)
matt@attorneyzim.com
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020

*Co-Counsel for Plaintiff Michael F. Abfall and the Putative Classes*

# EXHIBIT 1

Loan No. ▮▮▮▮▮▮▮

# FIXED RATE NOTE

### THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.

July 29, 2005                                    Orange                                    CA
[Date]                                            [City]                                    [State]

34175 DETROIT, AVON, OH  44011
[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 117,730.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is    Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of  6.750 %.

The interest rate required by this Section 2 is the rate I will pay before and after any default described in Section 6(B) of this Note.

### 3.  PAYMENTS

(A)  Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the first day of each month beginning on    October 1, 2005.

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on      September 1, 2020, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at:   505 City Parkway West, Suite 100, Orange, CA 92868

or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payments will be in the amount of U.S. $1,041.81.

### 4.  BORROWER'S RIGHT TO PREPAY

I may repay this Note at any time as provided for in this paragraph. If within the first  3.00 year(s), I prepay in any 12 month period an amount exceeding 20% of the original principal balance under this Note, I will pay a prepayment charge to Note Holder equal to one percent (1%) of the original principal amount of the mortgage.

### 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charged shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

### 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  fifteen  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed me.

Initials:

*M F H*

07/28/2005 10:09:11 AM

1 of 2

200-10H (Rev. 7/03)

L... ı No.

**(D)    No Waiver by Note Holder**
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**7.   GIVING OF NOTICES**
Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.   OBLIGATIONS OF PERSONS UNDER THIS NOTE**
If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.   WAIVERS**
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.   UNIFORM SECURED NOTE**
This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if prohibited by federal law as of the date of this Security Instrument.

If the Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)
Borrower:    MICHAEL F. ABELL
SSN:

_____ (Seal)
Borrower:
SSN:

_____ (Seal)
Borrower:
SSN:

_____ (Seal)
Borrower:
SSN:

2 of 2

07/28/2005 10:09:11 AM

PAY TO THE ORDER OF .
WITHOUT RECOURSE
AMERIQUEST MORTGAGE COMPANY
BY:
ASEEM MITAL, PRESIDENT/C.E.O.
BY:
KAREN CHRISTENSEN, C.F.O.

# EXHIBIT 2

Return To:

Ameriquest Mortgage Company
P.O. Box 11507,
Santa Ana, CA 92711

———————————————— [Space Above This Line For Recording Data] ————————————————

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated July 29, 2005 together with all Riders to this document.
(B) "Borrower" is MICHAEL F. ABFALL

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is Ameriquest Mortgage Company

Lender is a Corporation
organized and existing under the laws of Delaware

OHIO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036 1/01
07/28/2005 10:09:11

AMSOH (0311)
Page 1 of 16                          Initials:
          VMP Mortgage Solutions (800)521-7291

Lender's address is 1100 Town and Country Road, Suite 200  Orange, CA 92868

Lender is the mortgagee under this Security Instrument.

(D) "Note" means the promissory note signed by Borrower and dated July 29, 2005
The Note states that Borrower owes Lender one hundred seventeen thousand seven
hundred thirty and 00/100                                                                                 Dollars
(U.S. $ 117,730.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than September 1, 2020

(E) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(K) "Escrow Items" means those items that are described in Section 3.

(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

AM6DH (0311)                                     Page 2 of 16          Initials: _____          Form 3036 1/01

07/28/2005 10:09:11

(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the

| County | of | LORAIN | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number: 04-00-022-106-002                                    which currently has the address of
34176 dETROIT                                                                                    [Street]
AVON                                                                    [City], Ohio 44011               [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

AM6OH (0311)                         Page 2 of 15                Initials: _____    Form 3036  1/01
                                                                                         07/28/2005 10:09:11

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any,

AM8OH (0311)                              Page 4 of 15                    Initials _____                    Form 3036  1/01

07/28/2005 10:09:11

or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent

Initials: _____

AMSOH (0311)                          Page 5 of 15                          Form 3636 1/01



07/28/2005 10:09:11

the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be

AMSOH (0811)                     Page 6 of 16                     Form 3036  1/01

07/28/2006 10:09:11

applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although

AM8OH (0311)                    Page 7 of 18          Initials: _____          Form 3036  1/01



07/28/2005 10:09:11

Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

07/28/2005 10:09:11

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.



07/28/2005 10:09:11

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless

AM6OH (0311)                    Page 10 of 16                    Form 3036 1/01

Initials: _____



07/28/2005 10:09:11

MA

Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

AM6OH (0011)                    Page 11 of 15                    Form 3036  1/01



07/26/2005 10:09:11

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

AM6OH (0311)                          Page 12 of 15          Initials: _____          Form 3036  1/01

07/26/2005 10:09:11



NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Certain Other Advances. In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, LORAIN
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

AMGOH (0311)　　　　　　　　Page 13 of 15　　　Initials: _____　　　Form 3036 1/01



07/28/2005 10:09:11

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                          MICHAEL F. ABFALL          -Borrower

_____          _____ (Seal)
                                                                     -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                    -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                    -Borrower

_____ (Seal)   _____ (Seal)
                        -Borrower                                    -Borrower

AMGOH (0211)                    Page 14 of 15                    Form 3036  1/01
     07/28/2005 10:09:11

LORAIN

STATE OF OHIO,                    County ss:  JULY 2005

On this _____29_____ day of _____7th_____ , before me, a
                 Day                    Month/Year
Notary Public in and for said County and State, personally appeared
_____MICHALL   F.   ABFALL_____

_____

the individual(s) who executed the foregoing Instrument and acknowledged that he/she/they did
examine and read the same and did sign the foregoing Instrument, and that the same is
his/her/their free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

My Commission Expires:

JACK L. FLEMING, JR.
Notary Public - State of Ohio
My Commission Expires Nov. 24, 2007

_____
Notary Public

Prepared By:
Melissa Landy
6480 Rockside Woods Blvd., #140, Independence, OH 44131

400-16OH (4/82)                    Page 16 of 16

07/28/2005 10:09:11 AM

# EXHIBIT 3

Loan Modification Agreement
Schedule A

Name of Borrower(s): MICHAEL  ABFALL
Loan Number ▮▮▮▮▮▮

| DESCRIPTION OF TOTAL AMOUNT DUE | AMOUNT DUE |
|---|---|
| Current Principal Balance | $93,856.83 |
| Total Amount Capitalized | $5,470.83 |
| NEW PRINCIPAL BALANCE | $99,327.66 |

| ITEMIZATION OF AMOUNT DUE | | | Deferred Amount | Total Amount Due |
|---|---|---|---|---|
| Principal Reduction | | | | $0.00 |
| Delinquent Interest | From | 03/01/2010 | | |
| | To | 08/31/2010 | $0.00 | $3,123.97 |
| Property Inspections | | | $0.00 | $38.40 |
| Property Valuations | | | $0.00 | $300.00 |
| Accrued Late Charges | | | $324.63 | $324.63 |
| NSF Check Fees | | | $20.00 | $20.00 |
| Modification Fee / Document Preparation Fee | | | $0.00 | $650.00 |
| Title Report / Policy | | | $0.00 | $0.00 |
| Delinquent Taxes / Unpaid Insurance | | | $0.00 | $834.47 |
| Other Recoverable Advances | | | $0.00 | $1,200.58 |
| TOTALS | | | $344.63 | $6,492.05 |

| | |
|---|---|
| Borrower Contribution | $26.59 |
| Mortgage Insurance Contribution | $0.00 |
| Total Deferred Amount | $344.63 |
| Amt Towards 1st Due Pmt | $0.00 |
| Total Amount Capitalized | $5,470.83 |

| New Principal and Interest Payment Effective: ** 10/01/2010 | $723.60 |
|---|---|
| Monthly Tax Payment *** | $147.24 |
| Monthly Insurance Payment *** | $41.67 |
| Total Payment | $912.51 |

** If your loan contains an variable rate feature, your monthly principal and interest payment is subject to
change based on the terms of the Note and Modification Agreement.

*** Includes estimated amount for the monthly escrow payment (which is subject to change).

Borrower Initials here: *MFA*  *MFA*  *MFA*  *MFA*  *MFA*
*MFA*

# AMERICAN HOME MORTGAGE SERVICING, INC.
## SECURITY RETENTION AGREEMENT
### *(Providing for a Step Interest Rate)*

Re:  Loan Number: █████
     Property Address: 34175 DETROIT, AVON, OH 44011
     Borrower(s): MICHAEL F. ABFALL

This Security Retention Agreement (hereinafter "**Agreement**"), is made and entered into as of SEPTEMBER 1, 2010 (the "**Effective Date**") by and between American Home Mortgage Servicing, Inc. (hereinafter "**Loan Servicer**") and MICHAEL F. ABFALL (hereinafter collectively referred to as "**Borrowers**").

## RECITALS:

Borrowers executed that certain promissory note (hereinafter "**Note**") and mortgage, deed of trust or deed to secure debt (hereinafter "**Security Instrument**") on or about AUGUST 5, 2005, in the original principal amount of U.S \$117,730.00, (hereinafter collectively referred to as "**Loan**" or "**Loan Documents**"); and

Borrowers secured the Loan by virtue of the Security Instrument, covering the premises commonly known as 34175 DETROIT, AVON, OH 44011 (hereinafter referred to as "**Property**"); and

Borrowers debts have been discharged pursuant to a Chapter 7 bankruptcy, but Loan Servicer retained and reserved its right under the Security Instrument to foreclose on the Property; and

Borrowers have informed Loan Servicer that it wishes to remain in the Property and continue to make payments on the Loan; and

Loan Servicer has stated that it will forego pursuit of the legal remedies available to it, provided that Borrowers execute and fulfill the terms of this Agreement.

## AGREEMENT:

NOW THEREFORE, in consideration of the Loan Servicer forgoing pursuit of its legal remedies under the Security Instrument relating to foreclosure and sale of the Property, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrowers understand, acknowledge, covenant and agree as follows:

1. **Recitals:** The above recitals are true and correct and incorporated herein by reference.

LM000005.doc ((12-26-10)
V 1.2 (01-28-10)

2. **No Personal Liability:** *Since Borrowers' debts have previously been discharged pursuant to a Chapter 7 bankruptcy and since Borrowers did not sign an agreement reaffirming the Loan, this Agreement is not to be construed as an attempt to collect a debt from Borrowers personally. Borrowers understand and Loan Servicer acknowledges that Loan Servicer has no right and no intention to enforce the Loan against Borrowers and that Loan Servicer's only recourse, if the Loan is not current as set forth in the Loan Documents and this Agreement, is to foreclose on the Property.*

3. **Forbearance by Loan Servicer:** Even though Borrowers are no longer personally liable to repay the Loan, Loan Servicer reserves its right under the Security Instrument to foreclose on the Property, which Borrowers acknowledge and agree they pledged as security for the Loan. Borrowers hereby request that Loan Servicer forbear from pursuing foreclosure and enter into this Agreement, which specifies the steps they must take in order to allow them to retain the Property. In consideration of Borrowers' promise to abide, and only for so long as they continue to abide, by all of the terms and conditions of this Agreement, Loan Servicer hereby agrees to forbear from foreclosing on the Property.

4. **Payments:** In consideration of Loan Servicer forbearing from foreclosing and allowing Borrowers to remain in the Property, Borrowers must make monthly Property retention payments ("Payment" or "Payments") in the amounts and by the dates, and in accordance with the terms and conditions, as set forth in this Agreement.

    a. As of the Effective Date, the amount payable under the Note and the Security Instrument is U.S. $99,354.25 (the "**New Principal Balance**"), consisting of the unpaid amount(s) loaned to Borrowers by Lender plus any accrued and unpaid interest and other amounts capitalized as set forth in Schedule "A," attached hereto and made a part hereof.

    b. Borrowers shall pay an earnest money payment (the "**Deposit**") in the amount of U.S. $26.59, which Deposit must be received by Loan Servicer no later than 5:00 P.M. Eastern Time, AUGUST 2, 2010, either: (i) via overnight mail sent to the attention of American Home Mortgage Servicing, Inc., 6501 IRVINE CENTER DRIVE, IRVINE, CA 92618, in the form of guaranteed funds (certified check, cashiers check or money order) made payable to American Home Mortgage Servicing, Inc., or (ii) via Western Union "quick collect" to Code City: Option, Code State: CA.

    c. The Deposit shall be deducted from the New Principal Balance, for a total outstanding balance on the Loan of U.S. $99,327.66 (the "**Reduced Principal Balance**").

    d. Borrower promises to pay the Reduced Principal Balance, plus interest, to the order of Loan Servicer. The interest rate and monthly payment on Borrower's Note, and the applicable interest change dates and payment due dates, are modified as follows:

LM000036.dot (02-26-10)
V 1.2 (01-28-10)

| Year | New Interest Rate | Interest Rate Change Date | New Monthly Payment Due Date | New Payment Amount | Number of Payments |
|------|------------------|--------------------------|------------------------------|--------------------|--------------------|
| 2010 | 2.000% | SEPTEMBER 1 | OCTOBER 1 | $723.60* | 60 |
| 2015 | 3.000% | SEPTEMBER 1 | OCTOBER 1 | $752.34* | 12 |
| 2016 | 4.000% | SEPTEMBER 1 | OCTOBER 1 | $776.32* | 12 |
| 2017 | 4.670% | SEPTEMBER 1 | OCTOBER 1 | $791.36* | 72 |
|      | % |  |  | $     * |  |

*plus any amounts due for taxes and insurance, if applicable (see Schedule A).

If the Loan is an adjustable-rate mortgage ("ARM") loan and Borrower receives an ARM adjustment notice prior to the first New Monthly Payment Due Date indicated above, Borrower should ignore such notice and make payments in accordance with this Agreement. If on SEPTEMBER 1, 2023 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

    e. All Payments must be received by Loan Servicer, clearly marked with the above-referenced Loan number, no later than 5:00 P.M. Eastern Time on the date they are due.

    f. Payments are subject to increase at any time pursuant to paragraphs 5 and 6 below.

    g. As to each and every Payment made under this Agreement, *time shall be strictly of the essence and there shall be no grace period.*

5. **Additional Fees and Costs; Increase in Payment:**

    a. If not prohibited by the law of the state(s) where the Property and Borrower are located, all, additional fees, costs, expenses and charges relating to the Loan that have not been billed to or incurred by Loan Servicer or debited to the Loan account as of the Effective Date (including but not limited to late fees, appraisal and broker price opinion fees, property inspection fees, Loan Servicer advances for payment of Borrowers' taxes and/or insurance, attorney fees and expenses, collection fees and any other expenses incurred by Loan Servicer to protect its security interest in the Property), or clerical errors later discovered in the calculation of the Payments, (all of which fees, expenses, charges and errors, together with late charges, are collectively referred to as "Additional Costs"), are not included in the Payment amount and must be paid by Borrowers in order to fully satisfy the terms and conditions of this Agreement.

LM000006.doc (02-26-10)
V 1.2 (01-28-10)

b. In order to ensure payment by Borrowers of such Additional Costs, Loan Servicer may, where not prohibited by the law of the state(s) where the Property and Borrower are located, upon written notice by Loan Servicer to Borrowers and in Loan Servicer's sole and absolute discretion, either: (i) demand immediate payment in full of the Additional costs, (ii) add such Additional Costs to the Reduced Principal Balance, or (iii) add a prorata amount of the Additional Costs to the Payment in an amount necessary either to pay the Additional Costs by a certain date as specified in such written notice or to pay the Loan off by the Maturity Date.

6. **Taxes and Hazard Insurance; Increase in Payments:** Should Loan Servicer require Borrowers, pursuant to the terms of the Loan Documents, to establish an impound account with Loan Servicer for payment of taxes and insurance, or should the monthly contribution to any existing impound account increase pursuant to a periodic escrow analysis, the Payments may increase accordingly. Should the monthly contribution to any existing impound account *decrease* pursuant to a periodic escrow analysis, the Payments will decrease accordingly.

7. **Effect of Agreement; Forbearance:** *This Agreement shall be of absolutely no force or effect, and no action will be taken by Loan Servicer to forbear from foreclosing on the Property, or to postpone the foreclosure or sale of the Property (if applicable), unless and until Loan Servicer has received both this Agreement, fully executed by Borrowers, and any required Deposit in the form and in the manner as outlined in subparagraph 4b above by no later than 5:00 P.M. Eastern Time, AUGUST 2, 2010.* This Agreement is not considered "received" by Loan Servicer unless and until it has been internally date stamped by Loan Servicer and delivered in hand to The Home Retention Team at 6501 IRVINE CENTER DRIVE, IRVINE, CA 92618

8. **Material Breach and Termination of Agreement:** Borrowers shall be considered to be in material breach of this Agreement and this Agreement shall automatically terminate under any of the following circumstances:

   a. Borrowers fail to strictly comply with any of the terms of this Agreement or the Loan Documents as revised by this Agreement.
   b. The Property is abandoned or left vacant for more than sixty (60) days.
   c. Borrowers transfer any interest in the Property without Loan Servicer's prior written consent.

9. **Effect of Termination:** If this Agreement is terminated due to material breach as set forth above, the Loan Servicer shall be entitled to pursue its remedies pursuant to the terms and conditions of the Security Instrument as if this Agreement had never existed.

10. **No Defenses:** Borrowers agree that, except as set forth in paragraph 2 above, they have no defense, setoff or counterclaim related to the Loan or the Property, or to Loan Servicer's activities relating to the Loan or the Property.

11. **Advice of Attorney:** Borrowers warrant and represent that: (i) in executing this Agreement they have relied upon legal advice from the attorney of their choice, (ii) this Agreement has been read by Borrowers and such attorney, and its consequences (including risks, complications, and costs) have been completely explained to Borrowers by that attorney, and (iii) Borrowers fully understand the terms of this Agreement.

12. **Loan Documents:** All of the terms and conditions of the Security Instrument shall remain in full force and effect except as expressly modified by this Agreement. Nothing contained in this Agreement shall be construed to impair the Security Instrument or affect or impair Loan Servicer's rights or powers under the Security Instrument to recover any sum due under the terms of this Agreement, including any Additional Costs otherwise permitted by law. Borrowers will comply with all covenants, agreements, and requirements of the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the Effective Date:

    a. All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note.
    b. All terms and provisions of any adjustable rate rider, or other instrument or document (if any) that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

13. **Notice:** Any notice by Loan Servicer to Borrowers under this Agreement shall be deemed given if delivered by regular, certified or overnight mail to the Property address as it appears in this Agreement.

14. **Severability:** To the extent that any word, phrase, clause, or sentence of this Agreement shall be found to be illegal or unenforceable for any reason, such word, phrase, clause, or sentence shall be modified or deleted in such a manner so as to make the Agreement, as so modified, legal and enforceable under applicable law, provided that, should such modification or deletion materially diminish the benefit of this Agreement to either Loan Servicer, in its sole discretion and election, or Borrowers, in their sole discretion and election, the Agreement shall, only after written notice given by the electing party to the other party, be of no force or effect and the relationship of Loan Servicer and Borrowers shall be entirely governed by the provisions of the Loan Documents.

NOTICE TO BORROWERS WITH ADJUSTABLE RATE LOANS: For Borrowers with an adjustable-rate loan, please read this notice carefully. In accordance with subparagraphs 12(a) and (b) of this Agreement, Borrowers understand that the Loan is modified from an adjustable-rate loan to a step-rate loan. An adjustable-rate loan differs from a step-rate loan. With a step-rate loan, the interest rate stays the same during specified intervals as provided under paragraph 4(d) of this Agreement. With an adjustable-rate mortgage, the interest rate changes periodically, in relation to an index and a margin, and payments may go up or down accordingly. If interest rates decrease, an adjustable-rate loan could be less expensive over a long period than a step-rate loan. YOU UNDERSTAND THAT BY MODIFYING THIS LOAN TO A STEP-RATE LOAN, YOU ARE FOREGOING THIS POTENTIAL ADVANTAGE IN EXCHANGE FOR THE BENEFIT OF HAVING SPECIFIC STEP-RATES DURING A SPECIFIED PERIOD AND A FIXED RATE FOR THE REMAINING TERM OF THE LOAN.

IN WITNESS WHEREOF, the undersigned has/have caused this Agreement to be executed as of the date first above written.

Borrower: _____     Borrower: _____
MICHAEL F. ABFALL
Dated: 8-2-10                          Dated: _____

American Home Mortgage Servicing, Inc.

By: _____

:

# EXHIBIT 4



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!*®

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

02/27/2019

Sent Via First Class Mail
2341 9157 34
Loan Number: ▮▮▮▮▮▮▮

Michael F Abfall
34175 DETROIT RD
AVON, OH 44011-1962

Property Address: 34175 Detroit Rd
Avon, OH 44011-1962

## NOTICE OF DEFAULT

### AVISO IMPORTANTE PARA PERSONAS QUE HABLAN ESPAÑOL:

Esta notificación es de suma importancia. Puede afectar su derecho a continuar viviendo en su casa. Si no entiende su contenido, obtenga una traducción inmediatamente o contáctenos ya que tenemos representantes que hablan español y están disponibles para asistir.

### SPECIAL NOTICE IN THE EVENT YOU HAVE FILED BANKRUPTCY

If you have received an Order of Discharge in a Chapter 7 case filed under the Bankruptcy Code of the United States, this notice is not intended as an attempt to collect any debt from you personally. If you have received an Order of Discharge in a Chapter 11, 12 or 13 bankruptcy case, this notice is not an attempt to collect a pre-petition debt pursuant to a completed and confirmed Bankruptcy Plan. If the foregoing applies to you, this notice is sent to you only as a preliminary step to an "In Rem" foreclosure on the Mortgage against the above-referenced "Property." Provisions may be contained within the Mortgage/Deed of Trust that requires notice prior to foreclosure. As such, this is not an attempt to assert that you have any personal liability for this debt contrary to any entered Bankruptcy Order of Discharge.

In addition, if you have recently filed a petition under the Bankruptcy Code, this notice has been sent to you because we have not been notified of your bankruptcy case. If the foregoing applies to you, it is IMPORTANT that you or your bankruptcy attorney contact us immediately and provide us with the following information: date and jurisdiction of your filing, your case number and the bankruptcy chapter number under which you have filed.

---

NMLS # 1852

DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

Mortgage payments on the above referenced account are past due, which has caused a default under the terms of the Mortgage or Deed of Trust (hereinafter, "Security Instrument"). As of **02/27/2019**, the following amounts are past due:

| | |
|---|---|
| Principal and Interest | $1,582.60 |
| Interest Arrearage | $0.00 |
| Escrow | $520.60 |
| Late Charges | $116.76 |
| Insufficient Funds Charges | $40.00 |
| Fees / Expenses | $14.50 |
| Suspense Balance (CREDIT) | $77.62 |
| Interest Reserve Balance (CREDIT) | $0.00 |
| **TOTAL DUE** | **$2,196.84** |

In order to cure the default, payment for the entire total amount past due, plus any amount(s) becoming due in the interim, must be received on or before **04/05/2019**, via the addresses or methods listed on the payment remittance information section included in this notice. Please be aware, after acceleration of the debt, there may be expenses and attorney's fees and costs incurred by us to enforce the terms of the Security Instrument or mortgage agreement, in addition to the overdue amount on the mortgage account. Any payment to reinstate the Mortgage after acceleration must therefore include an amount sufficient to cover such expenses and fees incurred. Payments received after acceleration that are less than the amount required to reinstate the Mortgage may be returned, and may not stop any foreclosure proceedings already begun on the Property.
**PRIOR TO SUBMITTING A PAYMENT, PLEASE CALL US TO VERIFY THE EXACT AMOUNT PAST DUE ON THE ACCOUNT.**

Failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the Security Instrument, foreclosure by judicial proceeding and sale of the Property. Upon acceleration, the total obligation will be immediately due and payable without further demand. In foreclosure proceedings, we are entitled to collect the total arrearage in addition to any expenses of foreclosure, including, but not limited to, reasonable attorney's fees and costs. A customer has the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense to acceleration and foreclosure.

We will work with bankruptcy lawyers, foreclosure defense lawyers, housing counselors, and other authorized representatives of our customers. However, we will only release information once written authorization has been obtained, as required by law.

In addition, a U.S. Department of Housing and Urban Development ("HUD") counseling agency may be able to provide assistance. To locate the HUD-approved counseling agency, call the HUD Housing Counseling Service at 800.569.4287 or consult HUD's website at www.HUD.gov.

NMLS # 1852

DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

Page 2 of 4

  


**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

**Attention Servicemembers and Dependents:** Servicemembers on "active duty" or "active service," or a spouse or dependent of such a service member, may be entitled to certain legal protections under the federal Servicemembers Civil Relief Act (50 U.S.C. App. §§ 3901-4043) ("SCRA") regarding the service member's interest rate and foreclosure protections. SCRA and certain state laws provide important protections for you. If you are currently in the military service, or have been within the last twelve (12) months, please notify OCWEN immediately. Servicemembers and dependents with questions about SCRA should contact their unit's Judge Advocate, or their installation's Legal Assistance Officer. A military legal assistance office locator for all branches of the Armed Forces is available at http://legalassistance.law.af.mil/content/locator.php. Military OneSource is the U.S. Department of Defense's information resource. If you are listed as entitled to legal protections under SCRA, please go to www.militaryonesource.mil/legal or call 800.342.9647 (toll-free from the United States) to find out more information. Dialing instructions for areas outside the United States are provided on the website. Homeowner counseling is also available at HUD-certified housing counselors (http://www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm). You can also contact us toll-free at 800.746.2936.

If the mortgage account cannot be brought current, we should be contacted immediately to discuss possible alternatives to foreclosure. We want to help remedy the delinquent status of this account and would like to discuss alternatives that might be available. While our primary objective is the collection of past due amounts on the account, we want to work to find the best available alternative to bring the account current.

Please visit our website at www.ocwencustomers.com where the account can be reviewed and financial information entered.

For any questions or concerns, we can be reached toll-free at 800.746.2936. We are available Monday through Friday 8 am to 9 pm and Saturday 8 am to 5 pm ET.

Sunitha Augustine has been assigned as your relationship manager and will be your designated representative for resolution inquiries and submission of documents.

Sincerely,
*Loan Servicing*
**Toll Free Phone: 800.746.2936**

ADDRESS WRITTEN CORRESPONDENCE TO :
Ocwen Loan Servicing, LLC
Attention: Research Department
P.O. Box 24736
West Palm Beach, FL 33416-4736

NMLS # 1852

DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*



**Ocwen Loan Servicing, LLC**
www.ocwen.com
*Helping Homeowners Is What We Do!®*

1661 Worthington Road, Suite 100
West Palm Beach, FL 33409
Toll Free: 800.746.2936

## PAYMENT REMITTANCE INFORMATION
### (Always include the account number ▮▮▮▮▮ with any payment)

### Payment Methods

**Western Union**

Code City: OCWEN
State: Florida
Reference: Account Number ▮▮▮▮
Agent Locator: 800.225.5227

**MoneyGram**

Receiver Code: 2355
Payable to: Ocwen Loan Servicing, LLC
City, State: Orlando, Florida
Reference: Account Number ▮▮▮▮
Agent Locator: 800.926.9400

**Mail a Money Order/Certified/Regular Check**

For Regular Mail:
Ocwen Loan Servicing, LLC
P.O. Box 660264
Dallas, TX 75266-0264
For Overnight/Certified Mail:
Ocwen Loan Servicing, LLC
Box # 660264
1010 W. Mockingbird Lane, Suite 100
Dallas, TX 75247

**Bank Wire**

Bank: Wells Fargo Bank, NA
Ocwen Bank ABA Routing Number: ▮▮▮▮
Ocwen Bank Account Number: ▮▮▮▮
Account Name: Ocwen Loan Servicing, LLC
Reference: Account Number ▮▮▮▮
Property Address and Customer Name
Email Wire Details to:
Transferfunds@ocwen.com

NMLS # 1852

DEMAND05BKDCM

*This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally.*

# EXHIBIT 5

 **NewRez**

C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

October 14, 2020

Account Number: █████████

Michael F Abfall
P O Box 6031040
Cleveland, OH 44103

Property Address:
34175 Detroit Rd
Avon OH 44011-1962

Mortgagor(s): Michael F Abfall

PAYOFF QUOTE
VALID THROUGH November 12, 2020

Dear Customer(s),

A payoff quote was requested for account number █████████. The total amount
due is $ 51,953.59, which will be valid through November 12, 2020. After
this date, please request a new payoff letter.

As of the date of this letter, the mortgage payment due on January 01, 2019
has not yet been received and is now past due. If the payment was sent
recently, please allow some time to reflect the payment in our records.

Refer to the following pages for a detailed breakdown of this quote and for
payment instructions.

Payoff funds should be sent by wire transfer, cashier's check, certified
bank check, title company check, money order, attorney's escrow check,
MoneyGram or Western Union. Funds not remitted in one of these forms will
be returned, and the payoff will not be processed.

After receiving payoff funds, we will verify all amounts due and contact
the issuer of the funds in the event of any discrepancies.
After the payoff funds have been applied and the account has been
reconciled, any overpayment of funds will be returned to the remitter
through regular mail within 20 business days of the date the funds are
received. Please allow additional time for mailing.

For any questions, our Customer Care Center can be reached at the phone
number listed above Monday through Friday from 8:00 am to 9:00 pm and
Saturday from 8:00 am to 5:00 pm ET.

Sincerely,

Loan Servicing

1-911-BJK97-9000374-001-02-000-000-000-000

*Log in to MortgageQuestions.com --- your servicing website connection.*



**NewRez**
C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

See below for a breakdown of the total amount required to pay off the account referenced above on or before November 12, 2020, as well as complete payoff instructions.

Important Note: If there is an escrow account associated with the mortgage for property taxes and insurance, we may need to pay the tax and insurance bills before this payoff quote expires on November 12, 2020. Any additional disbursements made on behalf of the mortgage will be added to the amounts due on payoff.

A Lien Release Fee and Recording Fee are the cost the county in which the property is located charges to record a lien release as allowed pursuant to the terms of the security instrument. A Lien Release Fee and Recording Fee will only be charged when the loan is paid in full and as allowed by applicable law. A Lien Release Fee and Recording Fee will be assessed in the amount of the actual cost which may vary at the time of recording.

Due Date of Monthly Payment: January 01, 2019
Interest Rate 4.57000%

| | | |
|---|---|---|
| Principal | $ | 40,331.20 |
| Interest | | 3,588.12 |
| Escrow/Impound Overdraft | | 4,391.58 |
| Unpaid Late Charges | | 354.15 |
| Unpaid Returned Payment Charges | | 40.00 |
| Recoverable Balance | | 3,199.54 |
| Lien Release Fee | | 15.00 |
| Recording Fee | | 34.00 |
| Corporate Seconds | | .00 |
| Priority Stmt Fee | | .00 |
| Demand Statement Fee | | .00 |
| | | |
| TOTAL PAYOFF AMOUNT DUE BY 11-12-20 | $ | 51,953.59 |
| Bank Wire Fee | $ | .00 |
| TOTAL PAYOFF AMOUNT DUE VIA BANK WIRE TRANSFER BY 11-12-20 | $ | 51,953.59 |
| | | |
| Next Due Date | | 01-01-19 |
| Quoted Date | | 10-14-20 |
| Payoff Quote Expiration Date | | 11-12-20 |
| Original Principal Balance | $ | 117,730.00 |

*Log in to MortgageQuestions.com --- your servicing website connection.*



C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

### PAYOFF REQUIREMENTS AND CONDITIONS

Certified funds are required for payoff. Payoff funds must be provided
via certified funds, such as bank wire transfer, cashier's check,
certified bank check, title company check, money order, attorney's escrow
check, MoneyGram or Western Union. Non-certified payments will not be
accepted and the payoff will not be processed.

### HOW TO SUBMIT PAYOFF FUNDS

Bank wire transfers are preferred. Bank wire transfer is the fastest,
safest and most convenient payment option. Because this is the fastest
option, it may also save money on per-diem interest.

To make a bank wire transfer, provide the information listed under
payment methods to the remitting bank.

Be sure to always include the account holder's name, property address
and account number on any remittance. If funds cannot be wire
transferred, send the payment in certified funds by overnight mail as
shown below.

Details for bank wire transfer:
M & T Bank
1 MT Plaza, Buffalo, NY, 14203
ABA: ▆▆▆▆▆▆ / Account Number: 
Credit to: PHH Mortgage Services

Mail certified funds via overnight mail to:
PHH Mortgage Services
Attn: Cashiering / Payoff Department
Mail Stop SV-20
1 Mortgage Way
Mount Laurel, NJ 08054

All checks and money orders should be made payable to PHH Mortgage
Services. The mortgage account number, account holder's name and
property address must be included on the front of any check or money
order. For same-day processing, wire transfer, check and money order
payments must be received by 5:00 pm ET.

This payoff amount is subject to change. To the extent permitted by law,
our client reserves the right to correct any portion of this statement
at any time.

*Log in to MortgageQuestions.com --- your servicing website connection.*



**NewRez**

C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

IMPORTANT NOTICES

- Funds received after the "Total Amount Due to Pay Loan in Full" date indicated require additional interest of $ 5.05 per day.

- All balances are subject to change as a result of any transactions, the assessment of any fees or any costs being incurred with respect to the account that occur prior to the application of payoff funds.

- Similarly, if any payments applied to this account within the 30 days prior to the date of this payoff quote are reversed for any reason, including but not limited to insufficient funds or a stop payment being placed on a check, this payoff quote is deemed invalid. A new payoff quote must be obtained from us to reflect the correct amount due and owing. Subsequent payoff quotes will reflect the full amount due and are subject to change for the reasons referenced above.

- If the account is currently subject to a foreclosure action, we will not delay or dismiss any pending foreclosure action while awaiting your payoff payment. Additional attorney's fees and costs may accrue between the date of this letter and the date of payoff. In addition, these charges do not include additional advances that may be made after the date of this letter.

- Please contact this office to verify the exact amount due before tendering any funds.

- Overpayment or underpayment of payoff amount. After receiving payoff funds, we will verify all amounts due and contact the issuer of the funds in the event of any discrepancies. The payoff amount does not include any applicable positive escrow balance. After the payoff funds have been applied and the account has been reconciled, any overpayment of funds will be returned to the issuer through regular mail within 20 business days of the date the funds are received. Escrow account overages will be disbursed within 20 business days. Please allow additional time for mailing. Please be aware that to the extent permitted by law, if the payoff funds received are less than the total amount necessary to pay the account in full, any escrow funds remaining after payment of insurance and taxes due may be applied to the mortgage at payoff. In the event of an underpayment of the required stated payoff funds, if the escrow funds are insufficient to pay the account in full, we will return the funds and continue to accrue interest on the loan.

- Escrow disbursements will proceed until payoff funds are received. Issuing this payoff statement will not stop future escrow disbursements. Property taxes or insurance may be paid after this quote is issued. If such disbursements create escrow advances and change the amount due to satisfy the mortgage, this payoff quote will be deemed invalid. A new payoff quote must be obtained to reflect the correct amount due and owing. Subsequent payoff quotes will reflect the full amount due and are subject to change as referenced above.

- Past due fees still apply. If the account is past due, collection expenses and legal fees may be accruing.

- Per diem interest may change. If this is an adjustable rate mortgage, the per diem interest may change prior to payoff. The new per diem

*Log in to MortgageQuestions.com --- your servicing website connection.*



C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

interest will be applicable for the payoff as well.

- Mortgage insurance premium. If the account has mortgage insurance("MIP"),
  the account holder may also be required to pay an additional month of
  MIP if the payment is received in the calendar month following the
  "Total Amount Due to Pay Loan in Full" date.

- The security instrument (Deed of Trust or Mortgage) will be released
  after payoff. After receiving the entire payoff amount, we will
  execute a release and discharge of the Deed of Trust/Mortgage and, if
  necessary, will file a withdrawal in connection with any legal action
  that may have been taken with regards to this mortgage account.

- Please verify the Social Security number on file for tax reporting.
  Please visit our client's website at www.MortgageQuestions.com
  to verify the Social Security number on file for the purposes of
  year-end tax reporting, if applicable.

1-814-BK97-0000374 R01-44-000-000-000-000



C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

For any questions, our Customer Care Center can be reached at the phone
number listed above Monday through Friday from 8:00 am to 9:00 pm and
Saturday from 8:00 am to 5:00 pm ET.

Sincerely,
Loan Servicing

**NewRez**

C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

### *** PAYOFF STATEMENT ***

October 14, 2020

Loan No.: ▓▓▓▓▓▓

Mortgagor Name(s): Michael F Abfall

Property Address:   34175 Detroit Rd
                    Avon OH 44011

### ADDITIONAL COMMENTS

NO ADDITIONAL INFORMATION

XP995-070/KOT

*Log in to MortgageQuestions.com --- your servicing website connection.*



C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel NJ 08054

Tel 888-820-6474
Fax 856-917-8300

Important Messages

This communication is from a debt collector attempting to collect a debt;
any information obtained will be used for that purpose. However, if the
debt is in active bankruptcy or has been discharged through bankruptcy,
this communication is provided purely for informational purposes only with
regard to our secured lien on the above referenced property. It is not
intended as an attempt to collect a debt from you personally. As may be
required by state law, you are hereby notified that a negative credit
report reflecting on an accountholder's credit record may be submitted to
a credit reporting agency if credit obligation terms are not fulfilled.

Presorted First-Class Mail
U.S. Postage Paid
Taylor Communications

FIRST CLASS MAIL

PHH Mortgage Services
P.O. BOX 5452,
Mount Laurel, NJ 08054-5452

18    I JFGIP1    44103

# EXHIBIT 6

| DATE | TRAN AMT | DESCRIPTION |
|---|---|---|
| 10/21/2020 | $19.50 | INSPECTION FEE |
| 09/29/2020 | $19.50 | INSPECTION FEE |
| 09/24/2020 | $100.00 | FORECLOSURE COST - SALE FEE |
| 09/24/2020 | $551.05 | FORECLOSURE COST - COURT COSTS |
| 08/26/2020 | $19.50 | INSPECTION FEE |
| 08/12/2020 | $1,036.00 | FORECLOSURE COST - PUBLICATION FEE |
| 07/16/2020 | $15.00 | INSPECTION FEE |
| 06/17/2020 | $15.00 | INSPECTION FEE |
| 05/27/2020 | $15.00 | INSPECTION FEE |
| 04/20/2020 | $15.00 | INSPECTION FEE |
| 03/26/2020 | $15.00 | INSPECTION FEE |
| 02/18/2020 | $15.00 | INSPECTION FEE |
| 01/31/2020 | $50.00 | TITLE BRING-DOWN |
| 01/17/2020 | $15.00 | INSPECTION FEE |
| 01/08/2020 | $75.00 | FORECLOSURE COST - PROCESS FEE |
| 01/08/2020 | $75.00 | FORECLOSURE COST - PROCESS FEE |
| 12/17/2019 | $15.00 | INSPECTION FEE |
| 12/06/2019 | $575.00 | FORECLOSURE COST-FILING FEE |
| 11/18/2019 | $85.00 | PROPERTY APPRAISAL/BPO -AVM |
| 11/11/2019 | $15.00 | INSPECTION FEE |
| 11/01/2019 | $345.99 | TITLE FEE |
| 10/14/2019 | $15.00 | INSPECTION FEE |
| 09/23/2019 | $0.50 | INSPECTION FEE |
| 09/19/2019 | $15.00 | INSPECTION FEE |
| 08/16/2019 | $15.00 | INSPECTION FEE |
| 07/24/2019 | $14.50 | INSPECTION FEE |
| 05/29/2019 | $14.50 | INSPECTION FEE |
| 05/03/2019 | $14.50 | INSPECTION FEE |
| 03/27/2019 | $14.50 | INSPECTION FEE |
| 02/28/2019 | $14.50 | INSPECTION FEE |
| 01/02/2019 | $14.50 | INSPECTION FEE |
| TOTAL | $3,219.04 | |

| DESCRIPTION | Date ASSESSED | AMOUNT |
|---|---|---|
| LATE CHARGE | 06/04/2019 | $235.47 |
| BAD CHECK/NSF | 06/04/2019 | $40.00 |
| LATE CHARGE | 09/16/2019 | $39.56 |
| LATE CHARGE | 08/17/2020 | $39.56 |
| LATE CHARGE | 09/16/2020 | $39.56 |
| TOTAL | | $394.15 |

# EXHIBIT 7

Loan Number: ████████

Investor Loan Number: ████████

This document was prepared by PHH Mortgage Corporation

**After Recording Return To:**
PHH Mortgage Corporation
Attention: Modification Processing
PO Box 24737
West Palm Beach, FL 33416-9838

_____ [Space Above This Line For Recording Data] _____

## LOAN MODIFICATION AGREEMENT

Borrower (s):  MICHAEL F ABFALL

The debtor, MICHAEL F ABFALL, and Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-R9 through the servicer of the underlying mortgage loan agreement, PHH Mortgage Corporation, have agreed to modify the terms of said underlying mortgage loan agreement. Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-R9 is the owner of the loan and retains all rights to collect payments as per the underlying mortgage loan agreement. PHH Mortgage Corporation, remains servicer for said underlying mortgage loan agreement.

This Loan Modification Agreement ("Agreement"), made this 11th day of January, 2021 ("Modification Agreement Date"), between MICHAEL F ABFALL ("Borrower") and PHH Mortgage Corporation, Lender/Servicer or Agent for Lender/Servicer ("Lender"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") dated 07/29/2005 and recorded in the Records of Lorain County, OH and (2) the Note, bearing the same date as, and secured by, the Security Instrument (collectively, "Loan Documents"), which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at

34175 DETROIT RD
AVON, OH 44011

The real property described being set forth as follows:

**(Legal Description Attached, if applicable, for Recording Only)**

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything

to the contrary contained in the Note or Security Instrument):

**Representations:**

1. Borrower is experiencing a financial hardship and as a result, 1) is or will be in default under the Loan Documents and 2) does not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments due under the Loan Documents.
2. Under penalty of perjury, if required by the Lender, borrower provided Lender with full and complete information that, when provided, accurately stated borrower's income, expenses, and assets. To the extent requested by Lender, borrower provided documents that supported that information.
3. Borrower has made any and all required trial period plan payments or down payments.
4. Borrower currently has sufficient income to support the financial obligations under the Loan Documents, as modified by this Agreement.
5. Borrower understands that property title may be reviewed as a precondition to the modification.

**Acknowledgements and Preconditions to the Modification:**

1. Lender has no obligation to make any modification of the Loan Documents if any of the requirements under this Agreement are not met.
2. Prior to the Modification Effective Date (defined as 01/01/2021), if Lender determines that any of the representations above are no longer true and correct, 1) the Loan Documents will not be modified, 2) this Agreement will not be valid, and 3) Lender will have all of the rights and remedies provided by the Loan Documents.
3. The Loan Documents will not be modified unless and until 1) Lender approves this Agreement and 2) the Modification Effective Date has occurred.

**Modified Loan Terms:**

1. If all of Borrower's representations above continue to be true and correct and all preconditions to the modification set forth above have been met, the Loan Documents will automatically become modified on 01/01/2021. If Borrower has failed to make any payments that are a precondition to this modification or receipt of clear title is not received, this modification will not take effect.

   The new Maturity Date will be 03/01/2029.

2. The current Unpaid Principal Balance is $39,053.36. The New Principal Balance of the Note will be $49,370.47 (the "New Principal Balance"). This includes amounts and arrearages that are past due as of the Modification Effective Date (including, but not limited to, unpaid and any previously deferred principal and interest, fees, escrow advances and other costs, collectively, "Unpaid Amounts") excluding any fees, costs and/or corporate advances not added to the account as of the Modification Agreement Date and amounts not added to the New Principal Balance due to investor and/or mortgage insurer restrictions less any amounts paid to the Lender but not previously credited to the Loan. Any amounts not added to the New Principal Balance will remain on the account until paid and will become due when the interest-bearing balance is paid in full or upon maturity as applicable pursuant to State or Federal law.

3. The New Principal Balance may represent the sum of the "Deferred Principal Balance" (if applicable), the "Principal Forgiveness" (if applicable) and the "Interest Bearing Principal Balance." The Interest Bearing Principal Balance is $49,370.47. Borrower understands that by agreeing to add the Unpaid Amounts to the Unpaid Principal Balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. Borrower also understands that this means interest will now accrue on the unpaid interest that is added to the New Principal Balance, which would not happen without this Agreement.

4. Borrower promises to pay the New Principal Balance, plus interest, and any future fees/costs to the order of the Lender. Interest will be charged on the Interest Bearing Principal Balance at the yearly rate of 2.875%, beginning 01/01/2021. Borrower promises to make monthly payments of principal and interest of U.S. $565.83, beginning on 02/01/2021 and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. Borrower promises to also pay any applicable monthly escrow payments as outlined in this Agreement. The initial monthly escrow

amount is $311.47. The yearly rate of 2.875% will remain in effect until principal and interest are paid in full. If on 03/01/2029 (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date. Borrower agrees to pay in full all amounts still owed under the Note and the Security Instrument by the earliest of: (i) The date Borrower sells or transfers an interest in the Property, (ii) The date Borrower pays the entire Interest Bearing Principal Balance, or (iii) the Maturity Date.

The initial monthly escrow amount is $311.47. The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

Borrower's payment schedule for the modified Loan is as follows:

| Years | Interest Rate (%) | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* (adjusts periodically) | Total Monthly Payment* (adjusts periodically) | Payment Begins On | Number of Monthly Payments |
|---|---|---|---|---|---|---|---|
| 1 - 8.17 | 2.875 | 01/01/2021 | $565.83 | $311.47 | $877.30 | 02/01/2021 | 98 |

The escrow payments may be adjusted periodically in accordance with applicable law due to changes in property taxes, insurance amounts or other escrow expenses and therefore the total monthly payment may change accordingly. The escrow payment amount shown is based on current data and represents a reasonable estimate of expenditures for future escrow obligations; however, escrow payments may be adjusted periodically in accordance with applicable law.

**Additional Agreements:**

1. **Transfer of Property.** If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

2. **Original Loan Document Conditions.** Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument and Note, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument and Note; however, if applicable, the following terms and provisions are forever canceled, null and void, as of 01/01/2021:

   a. all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and

   b. all terms and provisions of any adjustable rate rider, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

3. Borrower understands and agrees that:
   a. **Default Under the Modification.** All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

b. **Original Loan Document Conditions.** All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender. Borrower agrees that the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

c. **Modification Does Not Constitute Release.** Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

d. **Costs and Expenses.** All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender or not permitted per State or federal law.

e. **Agreement to Provide Any Additional Modification Documents.** Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower. Borrower will execute such other documents as may be reasonably necessary to correct the terms and conditions of this Agreement if an error is detected after execution of this Agreement. Borrower understands that either a corrected Agreement or a letter agreement containing the correction will be provided to Borrower for Borrower's signature. At Lender's option, this Agreement will be void and of no legal effect upon notice of such error. If Borrower elects not to sign any such corrective documentation, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement. Borrower agrees to deliver any such corrective documents within ten (10) days after Borrower receives the Lender's written request for such replacement.

f. **Agreement of Use of Non-Public Information.** Borrower authorizes Lender, and Lender's successors and assigns, to share Borrower information including, but not limited to (i) name, address, and telephone number, (ii) Social Security Number, (iii) credit score, (iv) income, (v) payment history, (vi) account balances and activity, including information about any modification or foreclosure relief programs, with Third Parties that can assist Lender and Borrower in obtaining a foreclosure prevention alternative, or otherwise provide support services related to Borrower's loan. For purposes of this section, Third Parties include a counseling agency, state or local Housing Finance Agency or similar entity, any insurer, guarantor, or servicer that insures, guarantees, or services Borrower's loan or any other mortgage loan secured by the Property on which Borrower is obligated, or to any companies that perform support services to them in connection with Borrower's loan.

g. **Consent to Contact.** Borrower consents to being contacted by Lender or Third Parties concerning mortgage assistance relating to Borrower's loan including the trial period plan to modify Borrower's loan, at any telephone number, including mobile telephone number, or email address Borrower has provided to Lender or Third Parties.

4. **Escrow Account.** By this section, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked and Borrower has been advised of the amount needed to fully fund the Escrow Account.

Borrower will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents;

(d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items." Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount and Borrower shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this paragraph.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender and Borrower can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to Borrower any Funds held by Lender.

5. **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be or become prohibited or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Agreement.

6. **Inclusion of Exhibits.** Borrower authorizes Lender to attach an Exhibit A to this Agreement, which may include a Legal Description, recording information of the original security instrument, and any other relevant information required by a County Clerk (or other recordation office) to allow for recording if and when Lender seeks recordation.

7. **Errors and Omissions.** That if any documents related to the loan documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the Loan as modified, or is otherwise missing, Borrower will comply with the Lender's request to execute, acknowledge, initial and deliver to the Lender any documentation the Lender deems necessary. All documents the Lender requests of Borrower under this section shall be referred to as "Documents." Borrower agrees to deliver the Documents within ten (10) days after Borrower receives the Lender's written request for such replacement. At Lender's option, this Agreement will be void and of no legal effect and the loan terms will revert to the terms prior to the approved modification.

8. **Final Agreement.** This Agreement may not be supplemented, changed, modified or omitted except by written document executed by both the Lender and the Borrower. This Modification constitutes the entire agreement between the Lender and Borrower and supersedes all previous negotiations and discussions between the Borrower and the Lender and neither prior evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, terms, conditions, or obligations other than those contained in this Agreement.

9. **Additional Events of Default.** Without limiting the other events of default set forth in the Loan Documents, Borrower will be in default under this Agreement and under the Loan Documents upon the occurrence of any one or more of these events:

   a. Any material representation or warranty made by you in the Loan Documents, this Agreement, or any initial agreement proves to be false or misleading in any respect.

   b. Borrower fails to make the New Monthly Payments as required by this Agreement.

   c. Borrower sells or conveys any interest in the Property without Lender's prior written consent.

   d. Breach of any of the terms or provisions of this Agreement.

10. **Consequences of Default.** If Borrower defaults under this Agreement or the Loan Documents after the Modification Effective Date (your "Default"), Lender may, in addition to the remedies provided by the Loan Documents, subject only to applicable law, institute any foreclosure or collection proceedings without prejudice for having accepted any payments, including but not limited to the New Monthly Payments, under this Agreement and exercise any of its rights and remedies against Borrower under the Loan Documents and/or this Agreement.

11. **Mortgage Insurance.** Borrower understands that the mortgage insurance premiums on the Loan, if applicable, may increase as a result of the capitalization which may result in a higher total monthly payment. Furthermore, the date on which Borrower may request cancellation of mortgage insurance may change as a result of the New Principal Balance.

12. **Credit Reporting.** Lender is required to report factual information to the credit reporting agencies. Lender may report information about the account to credit bureaus. Late payments, missed payments, or other defaults on the account may be reflected in the credit report.

13. **No Novation.** Borrower expressly agrees that this Agreement is not a new loan from Lender but simply the modification of the existing obligations under the Loan Documents. Neither Borrower nor Lender has any intention to extinguish or discharge the indebtedness or the liens evidenced by the Loan Documents.

14. **Discharged Bankruptcy.** Notwithstanding anything to the contrary contained in this Agreement, Borrower and Lender acknowledge the effect of a discharge in bankruptcy that has been granted to Borrower prior to the execution of this Agreement and that Lender may not pursue Borrower for personal liability. However, Borrower acknowledges that Lender retains certain rights, including but not limited to the right to foreclose its lien evidenced by the Security Instrument under appropriate circumstances. The parties agree that the consideration for this Agreement is Lender's forbearance from presently exercising its rights and pursuing its remedies under the Security Instrument as a result of Borrower's default thereunder. Nothing in this Agreement shall be construed to be an attempt to collect against Borrower personally or an attempt to revive personal liability.

## BORROWER ACKNOWLEDGEMENT

**IMPORTANT – Do NOT sign this Agreement unless you are in the presence of a notary. If extenuating circumstances prevent one notary signature, separately signed and notarized agreements will be accepted; however, the agreements must be returned in the same package to PHH Mortgage Corporation.**

Each of the Borrower(s) and the Lender acknowledge that no representations, agreements or promises were made by the other party or any of its representatives other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

All individuals on the mortgage, note and the property title must sign this Agreement.

2/19/2021
Date

MICHAEL F ABFALL

State of _Ohio_

County of _Lorain_

On this _19th_ day of _February_, _2021_, before me, the undersigned, a Notary Public in and for said county and
state, personally appeared ___Michael F. Abell_____personally
known to me or identified to my satisfaction to be the person(s) who executed the within instrument, and they duly
acknowledged that said instrument is their act and deed, and that they, being authorized to do so, executed and delivered
said instrument for the purposes therein contained.

Witness my hand and official seal.



TERESA M. LEWANSKI
NOTARY PUBLIC
FOR THE
STATE OF OHIO
My Commission Expires
September 22, 2021

_Teresa M. Lewanski_
Notary Public

My Commission Expires: _09-22-2021_

## LENDER ACKNOWLEDGEMENT

### (For Lender's Signature Only)

Lender acknowledges that no representations, agreements or promises were made or any of its representations other than those representations, agreements or promises specifically contained herein. This Agreement, and the Note and Security Instrument (as amended hereby) set forth the entire understanding between the parties. There are no unwritten agreements between the parties.

PHH Mortgage Corporation

_____
Authorized Signer      Nadia S. Cordaro

MAR 08 2021

_____
Date

State of _____

County of _____

On this ___ day of _____, _____, before me, the undersigned, a Notary Public in and for said county and state, personally appeared _____, personally known to me or identified to my satisfaction to be the person who executed the within instrument as _____ of PHH Mortgage Corporation., said instrument is their act and deed, and that they, being authorized to do so, executed and delivered said instrument for the purposes therein contained.

Witness my hand and official seal.

_____
Notary Public

My Commission Expires: _____

# EXHIBIT 8



**NewRez**

C/O PHH Mortgage Services
P.O. Box 5452
Mt. Laurel, NJ 08054-5452

## Your monthly mortgage statement

To obtain information about your account:
Visit www.MortgageQuestions.com
Call toll free: 1-866-820-6474
Email us: CustomerCare@mortgagefamily.com
Fax: 1-856-917-8300

MICHAEL F ABFALL
C/O MARC E DANN
P O BOX  6031040
CLEVELAND, OH 44103-6800

6      R2      N21

Loan number:
Payment Date:  4/1/2021
Payment Amount: $877.30

**Statement Date:  3/9/2021**

### Bankruptcy Message

Our records show that either you are a debtor in bankruptcy or you discharged personal liability for your mortgage loan in bankruptcy.

We are sending this statement to you for informational and compliance purposes only. It is not an attempt to collect a debt against you.

If you want to stop receiving statements, write to us at: PHH Mortgage Services
PO Box 5406
Mt. Laurel, NJ 08054

### Account Information

| | |
|---|---|
| Property Address | 34176 DETROIT RD AVON, OH 44011 1992 |
| Outstanding Balance (not payoff amount) | $48,474.30 |
| Current Interest Rate | 2.8750% |
| Prepayment Penalty | No |
| Escrow Balance | -$1,141.07 |
| Suspense Balance | $1.50 |

### Explanation of Payment Amount

| | |
|---|---|
| Principal | $449.69 |
| Interest | $116.14 |
| Escrow (Taxes and/or Insurance) | $311.47 |
| Optional Products/Other | $0.00 |
| Regular Monthly Payment | $877.30 |
| Total New Fees and Charges | $0.00 |
| Outstanding Unpaid Fees, Returned Item Charges and Shortages | $0.00 |
| Accrued Expenses | $0.00 |
| Past Unpaid Amount | $0.00 |
| Total Payment Amount as of 3/9/2021 | $877.30 |

### Past Payments Breakdown

| | Paid Since Last Statement | Paid Year to Date |
|---|---|---|
| Principal | $898.17 | $898.17 |
| Interest | $3,020.28 | $3,020.28 |
| Escrow (Taxes and/or Insurance) | $5,014.52 | $5,014.52 |
| Fees | $394.15 | $394.15 |
| Optional Products | $0.00 | $0.00 |
| Partial Payment (Unapplied)* | $0.00 | $1.50 |
| Total | $9,325.12 | $9,326.62 |

### Important Messages

*Partial Payments: Any partial payments that you make are not applied to your mortgage, but instead are held in a separate suspense account. If you pay the balance of a partial payment, the funds will then be applied to your mortgage.

Please note that this is not the payoff quote and any amount less than the payoff quote will be returned. Please contact us for payoff quote.

### Transaction Activity

| Date Received | Date Effective | Description | Principal (S) | Interest (S) | Escrow (S) | Assessed Expenses/Other (S) | Optional Products (S) | Unapplied/Partial (S) | Total (S) |
|---|---|---|---|---|---|---|---|---|---|
| 02/09 | | Assessed Expense - INSPECTION FEE | $0.00 | $0.00 | $0.00 | $0.00 | $16.00 | $0.00 | $0.00 |
| 03/04 | 03/01 | Payment | $0.00 | $0.00 | $0.00 | $0.00 | $878.05 | $0.00 | $878.05 |
| 03/05 | | Non Cash Adjustment | -$15,911.11 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/05 | | Non Cash Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/05 | 03/05 | Escrow Deposit | $0.00 | $2,220.84 | $4,204.55 | $364.16 | $0.00 | $0.00 | $6,809.57 |
| 03/05 | 03/05 | Escrow Deposit | $0.00 | $0.00 | $0.00 | $40.00 | $0.00 | $0.00 | $40.00 |
| 03/05 | 03/05 | Assessed Expense - CAPPED MOD EXPEN Paid | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/05 | 03/05 | Escrow Deposit | $0.00 | $0.00 | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 |
| 03/05 | 03/05 | Assessed Expense - CAPPED MOD EXPEN Paid | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/05 | 03/05 | Escrow Deposit | $0.00 | $0.00 | $0.00 | $600.00 | $0.00 | $0.00 | $600.00 |
| 03/05 | 03/05 | Assessed Expense - CAPPED MOD EXPEN Paid | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/05 | 03/05 | Escrow Deposit | $0.00 | $0.00 | $0.00 | $360.00 | $0.00 | $0.00 | $360.00 |
| 03/05 | 03/05 | Assessed Expense - CAPPED MOD EXPEN Paid | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $409.10 |

Continued

# For your information

PHH Mortgage Services will perform all servicing activities for your mortgage loan.

**Pay by Phone:**
You can make a payment by calling the phone number on the front of the statement. To have your payment post the same business day, your payment must be completed by 8:00 pm ET, Monday through Friday.

**How we process your payment**
When you provide a check as payment, you authorize us either to use the information from your check to make a one-time electronic fund transfer from your account, or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day we receive your payment, and you will not receive your check back from your financial institution. If you would like to opt out of this program or if you have any questions, please call us at the phone number shown on the front of this statement.

**Receipt and Crediting of Payments**
Payments received Monday-Saturday at the address on the payment coupon provided will be credited the date of receipt if 1) in US dollars in the form of a check drawn on a US Bank, and 2) received in the envelope provided with the payment coupon enclosed. All other mailed payments are considered to be non-conforming and may not be credited for up to 5 business days. Please write your loan number on your check and do not send cash or attach your check to the payment coupon. Payments that otherwise comply with the 2 criteria stated but are received on legal holidays or on a Sunday may not be credited until the next business day.

**Information about taxes**
If you have an escrow account, we'll arrange with your tax authority to have your regular tax bills sent directly to us. However, some tax authorities may continue to send your regular tax bills to you directly. Your tax authority will send other types of tax bills, such as corrected, supplemental or special assessment bills, directly to you.

If you have an escrow account and you receive a tax bill, write your loan number on the bill and send it as soon as possible to:

PHH Mortgage Services
Attention: Tax Department
P.O. Box 24665
West Palm Beach, FL 33416-4665

For information about your escrow account, such as the date taxes were paid, the amount of taxes paid, or the property description used for tax purposes, visit the website shown on the front of this statement.

**Information about hazard insurance**
Maintaining a property insurance policy with the appropriate coverage and deductible amounts is a requirement under the Mortgage. To protect the mortgaged property, we request that you provide proof of Hazard Insurance Coverage, Fire and Extended Coverage, including windstorm and earthquake coverage, if required under the Mortgage. If your home is located in a FEMA designated flood zone, the Mortgage also requires that appropriate flood insurance be maintained.

If we do not receive the requested proof of insurance coverage we may purchase lender-placed insurance, after sending notice of our intent to do so. The coverage we obtain may not be comparable to a policy that you would choose. The cost of such insurance may be added to the monthly payment amount if you are making payments to keep the mortgage current, or may be recoverable from the proceeds of a foreclosure sale, pursuant to the Mortgage and applicable law, should foreclosure take place.

**Contact information for general insurance**
Mailing address:
PHH Mortgage Services
Attention: Insurance Department
P.O. Box 5954
Springfield, OH 45501-5954

Phone: 1-888-862-1855
Fax: 1-937-525-4210

For insurance updates, visit www.mycoverageinfo.com/mortgagefamily or send via email to MortgageFamily@MyCoverageInfo.com.

**Contact information for property damage and loss draft checks**
Mailing address:                         Phone: 1-888-862-1855
PHH Mortgage Services
Attention: Loss Draft Department
P.O. Box 7459
Springfield, OH 45501-7459

**Requests for Information and Notices of Error, including Qualified Written Requests**
If you wish to request information or assert an error relating to the servicing of your mortgage loan, including any Qualified Written Requests, you must use the address below and include your name, your mortgage loan account number, property address and a statement of either the information you are requesting or the error you believe has occurred:

PHH Mortgage Services
P.O. Box 66002
Lawrenceville, NJ 08648

**Fees**
The following is a list of fees we charge for the services indicated. We may charge a fee for this service subject to applicable provisions of the Bankruptcy Code and other applicable law. Additional fees may apply for services not listed. For additional information regarding fees, you or your Bankruptcy Counsel may contact us at the number on the front of your statement.

| Loan History | $0 - $10.00 |
| Returned Payment Fee | $0 - $25.00 |
| Paying by Phone or Web | $0 - $17.50 |
| Lien Release | $0 - $15.00 |
| Wire Fee | $0 - $25.00 |
| Certified Mail Fee | $0 - $15.00 |
| Payoff Quote | $0 - $30.00 |

**Important Information**
This communication is from a debt collector attempting to collect a debt; any information obtained will be used for that purpose. However, if the debt is in active bankruptcy or has been discharged through bankruptcy, this communication is provided purely for informational purposes only with regard to our secured lien on the above referenced property. It is not intended as an attempt to collect a debt from you personally. As may be required by state law, you are hereby notified that a negative credit report reflecting on an accountholder's credit record may be submitted to a credit reporting agency if credit obligation terms are not fulfilled.

**Information about Mortgage Counseling or Assistance**
If you would like contact information for counseling agencies or programs in your area, call the U.S. Department of Housing and Urban Development (HUD) at 800-569-4287 or visit www.hud.gov/offices/hsg/sfh/hcc/hcs.cfm.

Additional educational resources are available at Fannie Mae's Know Your Options website, https://www.knowyouroptions.com/. Additional payment assistance options are also available by contacting PHH Mortgage Services.

**State Disclosures**
Important Notice for Ohio Second-Mortgage Accounts:

Please be advised: (1) accountholders have the right to an attorney; (2) accountholders may qualify for relief under Chapter 7 or 13 of the United State Bankruptcy Code, 11 U.S.C. Chapter 7 or 13, as amended; and/or (3) accountholders who qualify under Chapter 13 of the United States Bankruptcy Code may be able to protect their residential real property from foreclosure.

 **NewRez**

C/O PHH Mortgage Services
P.O. Box 5452
Mt. Laurel, NJ 08054-5452

MICHAEL F ABFALL

To obtain information about your account:
Visit: www.MortgageQuestions.com
Call toll free: 1-888-920-5474
Email us: CustomerCare@mortgagefamily.com
Fax: 1-856-917-8300
Loan number: 

## Transaction Activity - Continued

| Posted Date | Received Date | Description | Principal ($) | Interest ($) | Escrow ($) | Fees, Other & Corporate ($) | Unapplied & Suspense ($) | Optional Products ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| 03/08 | 03/08 | Escrow Deposit | $0.00 | $0.00 | $0.00 | $277.57 | $0.00 | $0.00 | $277.57 |
| 03/08 | 03/08 | Escrow Deposit | $0.00 | $530.96 | $0.00 | $0.00 | -$530.96 | $0.00 | $0.00 |
| 03/49 | 03/49 | Payment | $117.93 | $118.26 | $311.47 | $0.00 | -$1,201.60 | $0.00 | $0.00 |
| 03/09 | 03/09 | Payment | $493.02 | $117.21 | $311.47 | $0.00 | $0.00 | $0.00 | $0.00 |
| 03/08 | | Return Item Charge Paid | $0.00 | $0.00 | $0.00 | $40.00 | $0.00 | $0.00 | $0.00 |

### Important Information

If it's not possible to make the monthly payment due to impacts from COVID-19, please notify us right away. You can notify us by filling out the COVID-19 Hardship Notification Form that is available on our website listed above. Click the "Learn More" link within the red Coronavirus banner for details. If you have other questions regarding COVID-19, you may also email or call us – please see the top of the billing statement for contact information. We appreciate your support in using the self-serve options as our wait times may be extended due to anticipated volume related to COVID-19.

We have engaged an attorney to represent us in proceedings to foreclose the mortgage lien against your property. Because you have discharged personal liability for your mortgage loan in bankruptcy, any payment that you make is voluntary. If you would like to make a payment, we recommend first contacting our attorney as the amounts reflected above may have changed. If you need the contact information for our attorney, you can contact our Customer Service Department at 866-947-7729. We encourage you to seek the advice of counsel for any questions you may have regarding your individual circumstances.

If you have been approved for a loss mitigation workout program, please refer to your agreement for payment details.

**PHH MORTGAGE SERVICES**
P.O. BOX 5459
MOUNT LAUREL, NJ 08054-5459

36 AHJNP1 44103

IMPORTANT PAYMENT INFORMATION
ENCLOSED

FIRST-CLASS
PRESORTED
U.S. POSTAGE
PAID
W. CALDWELL, NJ
PERMIT NO. 5

# EXHIBIT 9

    Cleveland | Columbus | Cincinnati | New Jersey | New York    

*216-373-0539*
*Telephone*

*Notices@DannLaw.com*
*Email*

*216-373-0536*
*Fax*

September 23, 2020

PHH Mortgage Services
P.O. Box 66002
Lawrenceville, NJ 08648

\*Sent via Certified Mail return receipt requested [ 7014 2120 0003 0673 0259 ]

**In the Matter of:**

Borrower's Name:        Michael Abfall
Property Address:       34175 Detroit Road
                        Avon, Ohio
Mortgage Account No.:   

**\*\*If responding to this correspondence by e-mail, please send to _notices@dannlaw.com_**

Re:  **Request for information pursuant to 12 C.F.R. § 1024.36 including a request for a
      payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3)**

Dear Sir or Madam:

This is a Request for Information related to your servicing of the mortgage loan of the
above-named borrower. All references herein are to Regulation X of the Mortgage Servicing Act
as amended by the Consumer Financial Protection Bureau pursuant to the Dodd Frank Act. The
written authority of the above-referenced borrower for this request to our law firm is enclosed.

Pursuant to 12 C.F.R. § 1024.36(d), you must respond to this request no later than _ten (10)
business days_ after your receipt of such.

Please provide the following information within the time periods noted, _supra_:

1.  The name, address, and appropriate contact information for the current owner or assignee
    of the above-referenced mortgage loan.

    a.  If the above-referenced mortgage loan is held in a trust for which an appointed trustee
        receives payments on behalf of such trust and Federal National Mortgage Association
        (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac) is the
        owner of such loan or the trustee of the securitization trust in which the loan is held,

---

Mailing Address
PO Box 6031040
Cleveland OH 44103

DannLaw.com
877-475-8100

Physical Address
2728 Euclid Ave Suite 300
Cleveland OH 44115



please also provide the name or number of the trust or pool in which such loan is held.

2. The identity of and address for the master servicer of the above-referenced mortgage loan.

3. The identity of and address for the current servicer of the above-referenced mortgage loan.

Please be advised said request is also being made under 12 U.S.C. § 1641(f)(2) of the Truth in Lending Act (TILA). For each violation of TILA, you may be liable to the borrower for actual damages, costs, attorney fees, and statutory damages of up to Four Thousand Dollars ($4,000.00).

Furthermore, this is also a written request for a payoff statement related to the above-referenced mortgage loan account for which you are the servicer.

Pursuant to 12 C.F.R. § 1026.36(c)(3), you "must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date" *within a reasonable time* after receipt of this request. Under no circumstances are you to fail to provide the requested payoff statement *within seven (7) business days* of receipt of this request.

Best Regards,

Molly Farkins

Molly Farkins

Enclosure

Mailing Address
PO Box 6031040
Cleveland OH  44103

DannLaw.com
877-475-8100

Physical Address
2728 Euclid Ave Suite 300
Cleveland OH  44115



Cleveland | Columbus | Cincinnati | New Jersey | New York



Telephone: 216-373-0539
Facsimile: 216-373-0536
Email: Notices@DannLaw.com

To: PHH Mortgage

Regarding Loan No.: MICHAEL ABFALL

Client Name(s): Michael Abfall

SSN Ending: MICHAEL ABFALL

To Whom It May Concern:

I/we give authorization for the firm of DannLaw LPA to speak on my/our behalf regarding the above-referenced loan number. Their contact information is as follows:

| | | | |
|---|---|---|---|
| Atty. Marc Dann | mdann@dannlaw.com | Atty. Javier Merino | jmerino@dannlaw.com |
| Atty. Daniel Solar | dsolar@dannlaw.com | Atty. William Behrens | billbehrens@dannlaw.com |
| Atty. Emily White | ewhite@dannlaw.com | Atty. Whitney Horton | whitney@dannlaw.com |
| Atty. Brian Flick | bflick@dannlaw.com | Amy Collins | amy@dannlaw.com |
| Atty. Michael Smith | msmith@dannlaw.com | Ashley Wilk | ashley@dannlaw.com |
| Edward Juhn | edward@dannlaw.com | Alison May | alison@dannlaw.com |
| | | Molly Forkins | molly@dannlaw.com |

The Dann Law Firm, P.O. Box 6031040, Cleveland, OH 44103
(216) 373-0539/telephone (216) 373-0536/fax
notices@dannlaw.com – general email

Signed: Michael Alfal    Date: 09 / 03 / 2020

Print Name: Michael Abfall

Mailing Address
PO Box 6031040
Cleveland, Ohio 44103

DannLaw.com
[877] 475-8100



7014 2120 0003 0673 0259

7014 2120 0003 0673 0259
7014 2120 0003 0673 0259



# EXHIBIT 10



| To: | The Dann Law Firm |
| --- | --- |
| Fax No: | 12163730536 |
| From: | Thakore, Hiren M |
| Contact No: | |
| Date: | 10-09-2020 9:47 AM |
| Subject: | Fax Message to 2163730536 |
| No. of Pages (with cover): | 2 |

*************************************************************************************
This E-mail message and any attachments are intended solely for the use of the addressee hereof and may contain information that is confidential, privileged and/or exempt from disclosure under applicable law. Delivery of this message to any person other than the intended recipient shall not constitute a waiver of any right, privilege or exemption. If you are not the intended recipient, please immediately notify the sender by reply E-mail and permanently delete this message from your system without reproducing or disclosing it to any third party. While Ocwen Financial Corporation and its subsidiaries take reasonable precautions to prevent transmission of software viruses, we cannot guarantee the same and we therefore disclaim liability for any damage sustained by you or any third party as a result thereof
*************************************************************************************

[end of cover page]

This fax was sent over the Concord network. To find out more visit www.concordfax.com



C/O PHH Mortgage Services
1 Mortgage Way
Mt. Laurel, NJ 08054

Tel: 888-820-6474
Fax: 856-917-8300

October 8, 2020

Account Number: ▆▆▆▆▆▆

The Dann Law Firm
Fax: 216.373.0536

**Accountholder(s):**
Michael F. Abfall
**Property Address:**
34175 Detroit Rd
Avon, OH 44011-1962

**RESPONSE LETTER
FOR YOUR RECENT REQUEST**

Dear Molly Forkins,

Thank you for the recent communication regarding the account referenced above in which we received the Request for Information correspondence dated September 23, 2020.

This response letter is in regard to the investor details only and we will send a separate response letter for the remaining queries outlined in the correspondence.

Below is the investor details:

Deutsche Bank Ntl Trst Co
1761 East St Andrew Place
Santa Ana, CA 92705
Phone: 714.247.6000

As the accountholder's personal liability for the debt obligation under the terms of the Note was discharged in a Chapter 7 Bankruptcy case, that accountholder is under no personal obligation to make any further mortgage account payments. The lender still possesses a secured lien against the property in the amount of the unpaid principal balance of the mortgage under the terms of the security instrument (Mortgage or Deed of Trust). To retain possession of the real property, however, the account must remain in a current payment status. All payments made on the account would be voluntary by the remitter.

We trust that the information provided has fully addressed the concern. Information about this account can also be found online at www.MortgageQuestions.com.

For any questions regarding this account or this request, we can be reached at the number referenced above Monday through Friday from 8:00 am to 9:00 pm and Saturday from 8:00 am to 5:00 pm ET.

Sincerely,

Research Department
Loan Servicing

*Log in to MortgageQuestions.com --- your servicing website connection.*

# EXHIBIT 11

Cleveland | Columbus | Cincinnati | New Jersey | New York




216.373.0539
Telephone

notices@dannlaw.com
Email

216.373.0536
Facsimile

November 24, 2020

PHH Mortgage Services*
P.O. Box 66002
Lawrenceville, NJ 08648

**Sent via Certified Mail return receipt requested [7015 1520 0001 6636 6061]*
***If responding via email, please respond to notices@dannlaw.com*

**In the Matter of:**

Borrower's Name: Michael Abfall
Property Address: 34175 Detroit Rd., Avon, OH 44011
Mortgage Account No. 

Re: **Notice of error pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to properly respond to a request for information as required by 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1)(D):**

Dear Sir or Madam:

This is a notice of error pursuant to 12 C.F.R. § 1024.35 of Regulation X of the Mortgage Servicing Act under RESPA. The written authority of the above-referenced successor-in-interest to the borrower (the "Borrower") authorizing our law firm to send this notice on their behalf concerning the above-referenced loan (the "Loan") is enclosed and incorporated herein by this reference. You must send written notice acknowledging receipt of this notice ***within five (5) business days***. *See* 12 C.F.R. § 1024.35(d). You must send your response to this notice ***within thirty (30) business days*** of receipt. *See* 12 C.F.R. § 1024.35(e)(3)(i)(C) 12 U.S.C. § 2605(k)(1)(C).

**Error pursuant to 12 C.F.R. § 1024.35(b)(11) for failure to properly respond to a request for information as required by 12 C.F.R. § 1024.36(d) and 12 U.S.C. § 2605(k)(1)(D):**

12 C.F.R. § 1024.36(d) provides:

> (1) *Investigation and response requirements.*
> (i) Except as provided in paragraphs (e) and (f) of this section, a servicer must respond to an information request by either:
> (A) Providing the borrower with the requested information and contact information, including a telephone number, for further assistance in writing; or

November 24, 2020
Page 2



(B) Conducting a reasonable search for the requested information and providing the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact information, including a telephone number, for further assistance.

(ii) *Extension of time limit.* For requests for information governed by the time limit set forth in paragraph (d)(2)(i)(B) of this section, a servicer may extend the time period for responding by an additional 15 days (excluding legal public holidays, Saturdays, and Sundays) if, before the end of the 30-day period, the servicer notifies the borrower of the extension and the reasons for the extension in writing. A servicer may not extend the time period for requests for information governed by paragraph (d)(2)(i)(A) of this section.

(2) *Time Limits.*

(i) *In general,* a servicer must comply with the requirements of paragraph (d)(1) of this section:

(A) Not later than 10 days (excluding legal public holidays, Saturdays, and Sundays) after the servicer receives *an information request for the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan* [emphasis added].

Further, "[a] servicer of a federally related mortgage shall not...fail to respond within 10 business days to a request from a borrower to provide the identity, address, and other relevant contact information about the owner or assignee of the loan". 12 U.S.C. § 2605(k)(1)(D).

12 C.F.R. § 1024.36(d)(2)(i)(A) explicitly acknowledges that a request for the "identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan" is a "Request for Information" pursuant to 12 C.F.R. § 1024.36. 12 C.F.R. § 1024.36(d)(2)(ii) provides that "[a] servicer may not extend the time period for requests for information governed by paragraph (d)(2)(i)(A) of this section."

The Borrower sent correspondence to PHH Mortgage Services ("PHH") dated September 23, 2020, via Certified Mail [Tracking No. 70142120000306730259] captioned "Request for information pursuant to 12 C.F.R. § 1024.36 including a request for a payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3)" (the "RFI"). *A copy of the RFI is enclosed for your reference.*

The RFI was a "request for information" issued pursuant to 12 C.F.R. § 1024.36 and 15 U.S.C. § 1641(f)(2), as explicitly stated in the RFI. The RFI constituted a request governed by 12 C.F.R. § 1024.36(d)(2)(i)(A) as it requested:

November 24, 2020
Page 3



1. The identity of and address for the current owner of the
   above-referenced mortgage loan.
   a. If the above-referenced mortgage loan is held in a trust for
      which an appointed trustee receives payments on behalf of
      such trust and Federal National Mortgage Association
      (Fannie Mae) or Federal Home Loan Mortgage Corporation
      (Freddie Mac) is the owner of such loan or the trustee of
      the securitization trust in which the loan is held, please also
      provide the name or number of the trust or pool in which
      such loan is held.
2. The identity of and address for the master servicer of the
   above-referenced mortgage loan.
3. The identity of and address for the current servicer of the
   above-referenced mortgage loan.

Per the tracking information for the RFI from the United States Postal Service (USPS), PHH
received the RFI on October 2, 2020.

PHH sent a response to the RFI via correspondence dated October 8, 2020 (the "Response").
Through the Response, PHH indicated:

> Below is [sic] the investor details:
>
> Deutsche Bank Ntl Trst Co
> 1761 East St. Andrew Place
> Santa Ana, CA 92705
> Phone: 714.247.6000

Upon information and belief, and by evidenced that the investor contact information refers to
Deutsche Bank National *Trust* Company, said entity does not directly own this loan but merely
acts as a trustee on behalf of a securitized trust which is the true owner or investor for the Loan.
PHH does not identify the trust on behalf of which Deutsche Bank National Trust Company acts.

Comment 2.ii. of the Official Interpretations of 12 C.F.R. § 1024.36(a) provides examples for
how the servicer is required to identify the owner or assignee for various forms of mortgage loan
ownership:

> ii. When the loan is held in a trust for which an appointed trustee
>     receives payments on behalf of the trust, a servicer complies
>     with § 1024.36(d) by responding to a borrower's request for
>     information regarding the owner, assignee, or trust of the
>     mortgage loan with the following information, as applicable:
>     A. For any request for information where the Federal National
>        Mortgage Association or the Federal Home Loan Mortgage
>        Corporation is not the owner of the loan or the trustee of

November 24, 2020
Page 4



> the securitization trust in which the loan is held: the name
> of the trust, and the name, address, and appropriate contact
> information for the trustee. Assume, for example, a
> mortgage loan is owned by Mortgage Loan Trust, Series
> ABC-1, for which XYZ Trust Company is the trustee. The
> servicer complies with § 1024.36(d) by identifying the
> owner as Mortgage Loan Trust, Series ABC-1, and
> providing the name, address, and appropriate contact
> information for XYZ Trust Company as the trustee.

Supplement I to Part 1024.

PHH's Response is plainly deficient on its face as it incorrectly identifies a company as the
owner of the Loan when in reality it is believed to be acting solely in the capacity of a trustee of
a securitized trust and PHH further fails to identify trust on behalf of which they are acting as
trustee. *See id.*

PHH's failure to properly respond to the RFI constitutes a violation of 12 C.F.R. § 1024.36(d).
PHH's actions, in violation of 12 C.F.R. § 1024.36(d), constitute a clear, distinct, and separate
error in the servicing of the Loan pursuant to 12 C.F.R § 1024.35(b)(11).

**Conclusion and Requested Actions:**

PHH has committed an error as to the Loan as discussed *supra*.

Please correct this error by providing the information requested through the RFI. Furthermore,
state the effective date of such correction(s) and provide contact information for further
assistance. In the alternative, after conducting a reasonable investigation and providing the
Borrower, *through our firm*, with a notification that includes a statement that the servicer has
determined that no such error occurred, a statement of the reason(s) for this determination, a
statement of the Borrower's right to request documents relied upon by the servicer in reaching
its determination, information regarding how the Borrower can request such documents and
contact information for further assistance.

*Please also remit funds, payable to our firm, for reimbursement of legal fees and costs incurred
by the Borrower for the preparation and mailing of the instant notice which would not have been
necessary but for PHH's failure to properly respond to the RFI. Please contact our office for a
final accounting of the fees and costs incurred in the review of the Response and the preparation
of, drafting of, and mailing of the instant notice as such amount will not be known until after this
correspondence is issued.*

November 24, 2020
Page 5



Best Regards,

*Malley Farhi*

Molly Forkins

Enclosures

  Cleveland | Columbus | Cincinnati | New Jersey | New York   

216-373-0539                          Notices@DannLaw.com                          216-373-0536
Telephone                                     Email                                      Fax

September 23, 2020

PHH Mortgage Services
P.O. Box 66002
Lawrenceville, NJ 08648

*Sent via Certified Mail return receipt requested [ 7014 2120 0003 0673 0259 ]

**In the Matter of:**

| | |
|---|---|
| Borrower's Name: | Michael Abfall |
| Property Address: | 34175 Detroit Road |
| | Avon, Ohio |
| Mortgage Account No.: | 8013027530 |

***If responding to this correspondence by e-mail, please send to notices@dannlaw.com*

Re:  **Request for information pursuant to 12 C.F.R. § 1024.36 including a request for a payoff statement pursuant to 12 C.F.R. § 1026.36(c)(3)**

Dear Sir or Madam:

This is a Request for Information related to your servicing of the mortgage loan of the above-named borrower. All references herein are to Regulation X of the Mortgage Servicing Act as amended by the Consumer Financial Protection Bureau pursuant to the Dodd Frank Act. The written authority of the above-referenced borrower for this request to our law firm is enclosed.

Pursuant to 12 C.F.R. § 1024.36(d), you must respond to this request no later than *ten (10) business days* after your receipt of such.

Please provide the following information within the time periods noted, *supra*:

1. The name, address, and appropriate contact information for the current owner or assignee of the above-referenced mortgage loan.

   a. If the above-referenced mortgage loan is held in a trust for which an appointed trustee receives payments on behalf of such trust and Federal National Mortgage Association (Fannie Mae) or Federal Home Loan Mortgage Corporation (Freddie Mac) is the owner of such loan or the trustee of the securitization trust in which the loan is held,



please also provide the name or number of the trust or pool in which such loan is held.

2. The identity of and address for the master servicer of the above-referenced mortgage loan.

3. The identity of and address for the current servicer of the above-referenced mortgage loan.

Please be advised said request is also being made under 12 U.S.C. § 1641(f)(2) of the Truth in Lending Act (TILA). For each violation of TILA, you may be liable to the borrower for actual damages, costs, attorney fees, and statutory damages of up to Four Thousand Dollars ($4,000.00).

Furthermore, this is also a written request for a payoff statement related to the above-referenced mortgage loan account for which you are the servicer.

Pursuant to 12 C.F.R. § 1026.36(c)(3), you "must provide an accurate statement of the total outstanding balance that would be required to pay the consumer's obligation in full as of a specified date" *within a reasonable time* after receipt of this request. Under no circumstances are you to fail to provide the requested payoff statement *within seven (7) business days* of receipt of this request.

Best Regards,

Molly Farkins

Molly Farkins

Enclosure

Mailing Address
PO Box 6031040
Cleveland OH 44103

DannLaw.com
877-475-8100

Physical Address
2728 Euclid Ave Suite 300
Cleveland OH 44115



7014 2120 0003 0673 0259

7014 2120 0003 0673 0259
7014 2120 0003 0673 0259



# ·USPS Tracking®

FAQs >

## Track Another Package +

**Tracking Number:** 70142120000306730259

Remove ✕

Your item was picked up at a postal facility at 11:07 am on October 2, 2020 in LAWRENCE
TOWNSHIP, NJ 08648.

## ✅ Delivered

October 2, 2020 at 11:07 am
Delivered, Individual Picked Up at Postal Facility
LAWRENCE TOWNSHIP, NJ 08648

**Get Updates** ∨

Feedback

---

### Text & Email Updates                                                    ∨

---

### Tracking History                                                         ∧

October 2, 2020, 11:07 am
Delivered, Individual Picked Up at Postal Facility
LAWRENCE TOWNSHIP, NJ 08648
Your item was picked up at a postal facility at 11:07 am on October 2, 2020 in LAWRENCE TOWNSHIP, NJ
08648.

October 2, 2020, 10:04 am
Available for Pickup
LAWRENCE TOWNSHIP, NJ 08648

10/13/2020                                    USPS.com® - USPS Tracking® Results

October 2, 2020, 10:03 am
Arrived at Unit
LAWRENCE TOWNSHIP, NJ 08648


October 1, 2020, 8:49 pm
Departed USPS Regional Facility
TRENTON NJ DISTRIBUTION CENTER


October 1, 2020, 6:48 am
Arrived at USPS Regional Facility
TRENTON NJ DISTRIBUTION CENTER


September 30, 2020
In Transit to Next Facility


September 29, 2020, 7:20 pm
Departed USPS Regional Facility
CLEVELAND OH DISTRIBUTION CENTER


September 29, 2020, 6:24 pm
Arrived at USPS Regional Facility
CLEVELAND OH DISTRIBUTION CENTER

Feedback

---

**Product Information**                                                    ⌄

---

See Less ⌃


# Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.


**FAQs**

USPS.com® - USPS Tracking® Results

Feedback





